[No. S020244. June 2, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS CIANEZ HERNANDEZ, Defendant and Appellant.

844

**COUNSEL**

Fern M. Laethem and Lynne S. Coffin, State Public Defenders, under appointments by the Supreme Court, Alison Pease and John Fresquez, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell, Louis M. Vasquez and Robert P. Whitlock, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Jesus Cianez Hernandez of one count of murder (Pen. Code, § 187).[1] The jury found that defendant had personally used a firearm in the commission of the offense (§ 12022.5), and it found true a special circumstance allegation that the murder was intentional and committed for financial gain (§ 190.2, subd. (a)(1)). The jury also convicted defendant of conspiracy to commit murder (§ 182), and it found true a special circumstance allegation that the object of the conspiracy was murder for financial gain. At the penalty phase, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).)

As we shall explain, we affirm the murder and conspiracy convictions as well as the financial gain special circumstance based on the murder conviction, but we strike the special circumstance based on the conspiracy conviction. We also conclude that numerous errors at the penalty phase of trial require reversal of the judgment of death.

## I. Facts

### A. Guilt Phase—Prosecution's Case

Alfredo Padilla and Brenda Prado were heroin and cocaine dealers who lived in a house in Grayson, a small town in Stanislaus County. Also living in the house (hereafter the Grayson house) were Betty Lawson and her boyfriend, Dallas White.

---

[1]Unless otherwise stated, all further statutory references are to the Penal Code.

The murder victim, Esther "Cussy" Alvarado, was a heroin addict and prostitute, who would buy heroin from Padilla and Prado and occasionally stay at their house. They later banned her from the house because she had not paid for drugs they had given her, and they suspected she had stolen a radio from the house.

On January 4, 1988, between 10:30 and 11:00 p.m., Anthony Ybarra (Ybarra) and his brother Gilbert came to the Grayson house. Gilbert, who was drunk, brought a lawn mower that he had stolen earlier in the day from Johnny Alvarado (no relation to murder victim Esther Alvarado) and which he hoped to exchange for drugs. Ybarra also wanted to buy drugs, but he knew Padilla and Prado would not sell to him because they suspected him of being a police informant.

When Ybarra and Gilbert arrived at the house, they saw Dallas White outside. Ybarra told White he wanted to buy heroin. While they were standing outside talking, Johnny Alvarado drove up, retrieved his lawn mower from Gilbert, and headed home. Gilbert accompanied him, apparently hoping to persuade him not to report Gilbert's theft of the lawn mower to the police. Ybarra remained outside the Grayson house.

As Ybarra and White continued their conversation, Ybarra saw defendant, whom he had known for many years, drive up to Guzman's Bar, some 500 feet away. A woman with long hair was with defendant. After dropping off the woman at the bar, defendant drove to the Grayson house. Ybarra feared defendant because, while working for the police, Ybarra had "set up" the boyfriend of defendant's sister and had testified against him. He therefore hid behind a car as defendant and White entered the house.

Ten to 15 minutes later, Ybarra saw defendant, Padilla, and Prado go out the back door of the house and enter a small trailer. Ybarra crept through a hole in a fence and peeked through a window of the trailer, hoping to find out where Padilla and Prado hid their drugs so he could steal them. Ybarra heard defendant say, "that bitch, Cussy [Alvarado]" was waiting for him at Guzman's Bar, and Prado and Padilla complained that Alvarado had "ripped them off." Defendant offered to beat up Alvarado, and when Prado and Padilla expressed interest, he said he would kill her "for the right price." Prado replied she would give defendant two grams of heroin and an eighth of an ounce of cocaine to kill Alvarado. Defendant said, "Consider it done," and he and Padilla shook hands. Defendant, Prado, and Padilla then left the

trailer and returned to the house. Shortly thereafter, Ybarra watched as defendant left the house and got in his car, drove back to Guzman's Bar, picked up Alvarado, and drove off with her between 11:30 and 11:45 p.m. Dallas White then gave Ybarra a ride home.

According to Lorenzo Guzman, the owner of Guzman's Bar, Esther Alvarado left his bar between 11:30 and midnight, after staying 15 to 20 minutes. Guzman saw her enter the passenger side of what he thought was a tan Oldsmobile car.

Between midnight and 1:00 a.m., Rudy Galvan was driving home from work when he saw a body lying by the road. He drove to Guzman's Bar, about a mile away, and asked Guzman to call the police. Stanislaus County Sheriff's deputies responding to the call found Esther Alvarado's body. She had been shot to death. Alvarado's right fingers were muddy, and what appeared to be scratch marks were in the mud next to her body. A thick track of mud was on the road, made by two wheels of a car.

Later that night, Homicide Detective Michael Dulaney drove to the nearby town of Patterson. At the home of Guadalupe Porter, defendant's sister, Dulaney saw a black and gold Oldsmobile, which belonged to defendant and his sister. The car had a large quantity of wet mud on the left side and the rear bumper; there also was mud on the gas pedal. On the dashboard was a box of Winchester .22-caliber cartridges. On the floor of the car was a similar .22-caliber bullet, and an expended .22-caliber casing was under the seat. On the ground near the car were two shotgun shell casings. The police entered Porter's house and arrested defendant.

Later that morning, Deputy Sheriff Richard McFarren questioned defendant. Defendant said that during the previous night he had taken a woman named Ana (identified by other witnesses as Ana Najera) to a motel in Modesto, dropped her off, and returned to his sister's house. He denied going to the Grayson house. When asked about the mud on the car, defendant said that after dropping off Najera, he had driven through mud on his way to the Candyland apartments to buy drugs. He claimed the bullets in the car were there when it was purchased. He did not say when he had bought the car.

Sheriff's Investigator Mike Clements interviewed Guadalupe Porter, defendant's sister. She said she had borrowed a shotgun and some ammunition from Brenda Prado, but when asked to locate them she could not do so.

That same morning, Ybarra learned from Esther Alvarado's brother that she had been killed. Sometime later, Deputy David Nirschl questioned

Ybarra about the lawn mower his brother Gilbert had stolen from Johnny Alvarado. When Ybarra volunteered that he had information about the murder, Nirschl took him to see Raul DeLeon, one of the deputies investigating the murder. Ybarra told DeLeon that he had overheard defendant, Prado, and Padilla planning to kill Esther Alvarado.

Dr. William Ernoehazy performed an autopsy on Esther Alvarado. Her body contained a .22-caliber bullet, as well as shotgun pellets, wadding, and a slug. The path of the slug through her body indicated that it had been fired downward into her back at a distance of roughly three feet while she was lying on the ground. Criminalist John Yoshida testified that the copper wash and the design of the bullet found in Alvarado's body were "exactly the same" as the Winchester cartridges found in defendant's car.

Shortly after the murder, Brenda Prado moved to Oklahoma, where she lived with her daughter, Valerie Castillo. Three months later, Castillo found a double-barreled sawed-off shotgun hidden in the springs of a couch Prado had brought with her. According to Criminalist Michael White, the two shell casings found in defendant's front yard the morning after Alvarado was killed were fired from this shotgun, the slug found in Alvarado's body was "probably" fired from the gun's right barrel, and the wadding found in Alvarado's body was "consistent with" the shells retrieved from defendant's front yard.

Eleven months after the murder, Deputy District Attorney Michael Stone and District Attorney Investigator Alan Fontes were preparing for the trial of Alfredo Padilla who, like defendant, was charged with Alvarado's murder. Looking closely at a slide projection of Alvarado's body taken at the crime scene, they discovered that what sheriff's deputies had thought to be scratch marks in the mud next to her body were letters spelling "Jesse" (defendant's first name). According to Dr. Ernoehazy, who performed the autopsy, Alvarado died some 15 minutes after being shot, and she could have remained conscious long enough to write defendant's name in the mud.

Deputy Daniel Cron checked defendant's car for fingerprints. On the outside of the passenger's side window he found a latent print that matched Alvarado's right middle finger.[2]

B. *Guilt Phase—Defense Case*

Defendant presented an alibi defense, claiming that someone living at the Grayson house had killed Esther Alvarado and had framed him by writing "Jesse" in the mud next to Alvarado's body.

---

[2]Alfredo Padilla and Brenda Prado were tried separately for Alvarado's murder. Padilla was convicted of capital murder and sentenced to death, and we affirmed the judgment. (*People v. Padilla* (1995) 11 Cal.4th 891 [47 Cal.Rptr.2d 426, 906 P.2d 388].)

Fifteen-year-old Steven Rodrigues, Guadalupe Porter's son and defendant's nephew, testified that on the night of the murder, defendant left their house shortly after 6:30 p.m. to take Ana Najera home. Defendant returned an hour later and watched television with Steven until about 10:30 p.m., when they fell asleep in the living room. Defendant was still asleep at 6:30 the next morning when Steven, a paper boy, got up to deliver newspapers.

Steven also testified that Alfredo Padilla and Brenda Prado had come to visit on New Year's Eve (four days before the murder of Alvarado) and Padilla in celebration fired off a sawed-off shotgun in front of the house. According to the defense, this explained the presence of the shotgun shells the police found in front of the house the morning after the murder.

Defendant's sister, Guadalupe Porter, testified that Esther Alvarado had often been a passenger in defendant's car. That, the defense claimed, explained the fingerprint the deputies had found on the car window.

Through testimony of defense witnesses and cross-examination of the prosecution's witnesses, the defense tried to show that Ybarra had left the Grayson house long before defendant arrived there. Therefore, the defense theorized, Ybarra must have made up the conversation in which defendant, Padilla, and Prado discussed killing Esther Alvarado. According to the defense, Ybarra's motivation was to avoid prosecution for helping to steal Johnny Alvarado's lawn mower and to obtain other favors from the Stanislaus County District Attorney's Office. The defense presented evidence of Ybarra's long criminal record for theft and for alcohol- and drug-related offenses and the repeated dismissal of these charges by the district attorney's office, possibly in exchange for information. To refute Ybarra's testimony that he no longer used drugs, Donald Yarbary testified that Ybarra had used heroin with him the week before trial.

The defense also tried to show that no conversation could have occurred in the trailer where, according to prosecution witness Ybarra, he overheard defendant plan to kill Esther Alvarado. Dallas White described the trailer as a "dump" that "nobody used." His testimony was corroborated by Enrique Jiminez, a drug user and frequent visitor to the Grayson house. Tom Lilly, who moved into the Grayson house after Alvarado's murder, described the trailer as "all caved in, [with] water in it and garbage all the way up."

C. *Penalty Phase—Prosecution's Case*

The prosecution presented evidence that in 1982 defendant killed Robert Caseri (Caseri). Defendant was arrested for this crime, but was not prosecuted because the district attorney's office believed it had insufficient evidence.

Caseri lived in Patterson, Stanislaus County. On February 15, 1982, he telephoned his sister, Karen Linn Hatcher. He was crying. He told Hatcher to remember the names of defendant, Earl Rodrigues, and Arnulfo "Fish" DeLeon, because they were going to kill him. When Hatcher saw Caseri two days later, he was nervous and again said that defendant, Rodrigues, and DeLeon were going to kill him. She never saw her brother again. Nor did her mother, Billie Jean Caseri, who last saw her son on February 18, 1982.

The next week, the two women made inquiries in town to find out what had happened to Caseri. They talked to Sal Banda, who worked at the Red Lion Cocktail Lounge in Patterson. Banda said that on the night of February 19, 1982, he saw Caseri buying drinks for defendant and Rodrigues; that defendant and Caseri got into a fight, and Caseri was hurt; that Banda had offered to take Caseri to the hospital, but Caseri refused, saying that defendant and Rodrigues were going to "get" him. Banda had not seen Caseri since.

On March 2, 1982 Patterson Police Officer Tony Zavala, who was investigating Caseri's disappearance, spoke to Banda. Banda said that on the night of Caseri's disappearance, Banda saw him drinking with defendant, DeLeon, and Rodrigues. Caseri had a "wad of bills" and was paying for the drinks. At Banda's suggestion, Caseri gave the money to Patty Poso, another bartender, for safekeeping. Later, Banda saw that Caseri was bleeding from the head, and Caseri told Banda that defendant had beaten him up because he had refused to buy defendant more beer. Caseri left the bar about 11:00 p.m. but returned "later on," and Banda saw defendant sitting next to Caseri drinking beer. Around midnight, Banda looked for Caseri, but he and defendant were gone. DeLeon and Rodrigues were still in the bar. (At trial, Banda denied remembering much of this statement, and his conversation with Zavala was admitted as a prior inconsistent statement.)

Officer Zavala also interviewed Earl Rodrigues, who said that on the night Caseri disappeared he was at the Red Lion with defendant when they saw Caseri, an old friend of defendant's. Defendant and Caseri left for a short time and then returned, and Caseri bought "everybody" several rounds of beer. Later, threats were exchanged between defendant and Caseri. The two men, accompanied by Rodrigues, then went outside the bar. There, defendant knocked Caseri down, grabbed him by the hair, and slammed his head into the pavement. Rodrigues and several other men broke up the fight, and they all went back in the bar. After midnight defendant told Rodrigues that he and Caseri were going to another bar, and the two of them left. At 1:30 a.m., Rodrigues left the bar and discovered his car was gone. Defendant, who had the keys, returned with the car a few minutes later, and they drove home. In a second interview a month later, Rodrigues gave a similar

statement, with the only significant difference being that he mentioned that defendant left the bar for a period of time after the fight, and then returned before departing with Caseri. (As with witness Banda, Rodrigues denied remembering much of these statements, which were then admitted as prior inconsistent statements.)

Between 11:00 and 11:30 p.m. on the night Caseri disappeared, Patterson Police Officers Louis Bonacich and Jeff Shively saw a pool of fresh blood, 12 to 15 inches in diameter, in an alley outside the Red Lion bar. They checked the Red Lion and two other nearby bars, but found no indication that anyone had been in a fight or had been injured.

Caseri's body, severely decomposed, was found in the Delta-Mendota Canal in April 1982. According to Dr. William Ernoehazy, who performed an autopsy on the body, Caseri had been dead one to three months. He had been killed by at least six blows to the head, which had been inflicted by both ends of a claw hammer.

In the early morning hours of April 3, 1982, Jack Price, then a Patterson police officer, waited in plain clothes outside defendant's home to arrest him when he arrived. Defendant drove up at 1:30 a.m. As he got out of his car, a neighbor warned him that a police officer was present. Defendant got back in his car and drove away at high speed. Several blocks later defendant stopped the car abruptly and tried to run away, but halted when he heard Price "rack" his shotgun. Referring to a woman who was a passenger in his car, defendant said, "Leave her alone, man. She don't know nothing about it." At that point, however, Price had not told defendant why he was arresting him, and defendant never clarified what it was that the woman knew nothing about.

Two weeks later, Criminalist Kenneth Penner tested Earl Rodrigues's car for blood. He found small stains of human blood on the back of the front passenger seat and on the foam mat in the back of the car. The backseat of the car had been removed and was never tested.

The prosecution also presented evidence that in 1977 defendant and an accomplice robbed Mary Toste and her mother at their small market in Turlock, Stanislaus County. Defendant used a gun in the robbery, and as he fled he fired a shot into the store counter near Mary's legs. He was convicted of robbery.

The prosecution presented documentary evidence that defendant was convicted of burglary, a felony, in 1983.

D. *Penalty Phase—Defense Case*

At the penalty phase of his capital trial, defendant presented not only evidence to rebut the prosecution's claim that he had killed Caseri, but also evidence about his childhood and drug use.

To explain the bloodstains in Earl Rodrigues's car, Guadalupe Porter (defendant's sister and Rodrigues's ex-wife) testified that on April 3, 1982, she, Rodrigues, and three of their children were riding in the car when it was involved in an accident. Several occupants of the car were injured and bled. The family went to the hospital, where Rodrigues was arrested for the murder of Caseri. To explain the removal of the rear seat of the car (which would have been covered with blood if it had been used to transport Caseri), Porter said her brother-in-law, Alex Rodrigues, had removed it because he wanted to get some tools in the car's trunk, and he did not have a key. To corroborate Porter's testimony about the accident the defense presented hospital records and testimony from the officer who arrested Rodrigues at the hospital.

Porter also testified that as a child defendant had many friends. Later, when his sister Esther went to jail, defendant supported and took care of her four children for about four months.

Ernesto Hernandez, defendant's brother, testified that he and defendant grew up in a family of 11 children, five of whom were alive at the time of trial. Their father was a farm laborer, and neither he nor defendant's mother abused the children. As a child, defendant was an altar boy, obeyed his parents, got along with others, and stayed out of trouble. He did well in school, liked sports, and stayed after school to improve his grades.

The defense introduced academic records to show that defendant did well in courses at Columbia Junior College in Tuolumne County, which he took while incarcerated at the California Youth Authority.

Nurse Rick Lindsey of the Haight-Ashbury Drug Detoxification Clinic in San Francisco described heroin addiction as a "chronic and progressive disease," which "without treatment always gets worse." He explained that it is very difficult to stop using heroin because, although most of the physical symptoms of withdrawal will be gone in a week, the psychological dependency and "intense craving" for the drug persist for years. Noting that defendant once told a probation officer he had started using heroin at the age of 14, Lindsey testified that heroin use from this early age would be an "extremely severe" addiction that would cause arrested psychological development. Defendant also introduced jail records showing that he was treated

for heroin withdrawal when he was taken to the jail after being arrested the morning after the death of murder victim Esther Alvarado.

## II. Guilt Phase Issues

### A. *Deputy District Attorney Berrett's Participation in the Prosecution*

Deputy District Attorney Michael Stone was assigned to try defendant's case. But on the first day of trial, Chief Deputy Holly Berrett appeared for the prosecution, explaining that Stone had pneumonia. The next day, as the trial court was screening prospective jurors for hardship, Berrett announced that defendant had subpoenaed her because she had been at the crime scene on the night Esther Alvarado was killed and because she could testify as to whether the district attorney's office had offered compensation to prosecution witness Ybarra in exchange for his testimony. Berrett had previously testified at the trial of Alfredo Padilla, who was also convicted of murdering Alvarado. (See *People v. Padilla, supra,* 11 Cal.4th at p. 931.) Defendant asked the trial court to recuse Berrett from further participation in the case except as a witness.

The trial court asked if defendant was requesting a mistrial. Defendant said he saw no problem with Berrett's participation in the prosecution up to that point, but he believed a problem would arise if she continued. The court recused Berrett from any further participation in the trial. For the next three days, Deputy District Attorney James Brazelton represented the People, until Deputy District Attorney Stone recovered. Stone handled the rest of the trial.

At the guilt phase of trial, the prosecution called Berrett to testify. She described her observations as the district attorney's representative at the crime scene on the night of Alvarado's murder; she said the only consideration her office had given to witness Ybarra in exchange for his testimony was to ask the jail to allow him to serve an eight-month jail sentence in another county and under an assumed name.

 Defendant asserts that Attorney Berrett violated the trial court's recusal order, claiming she "remained involved" in the case. He notes that Berrett assigned Attorney Brazelton to handle the prosecution until Attorney Stone's recovery from his illness, and that she provided a questionnaire for Brazelton to use during voir dire.

We find no violation of the trial court's order. A defendant's motion to disqualify a prosecutor "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely

that the defendant would receive a fair trial." (§ 1424.) Here, the trial court appropriately disqualified Chief Deputy Berrett from *direct* participation in the prosecution of defendant's case, because if she became a witness she and the defense attorneys would face the awkward task of arguing Berrett's credibility to the jury, and because the jury might find it difficult to separate her roles as prosecutor and witness. (See generally *People ex rel. Younger v. Superior Court* (1978) 86 Cal.App.3d 180 [150 Cal.Rptr. 156].) But the trial court's order did not prohibit Berrett from assigning an attorney to represent the prosecution or from giving that attorney questions to ask the jury. Nor was there any reason for the court to do so. Performing these tasks could not lead to jury confusion, and we see no evidence that Berrett's observations at the scene of the murder caused her to do these tasks in a manner that violated defendant's right to a fair trial.

Defendant speculates that Berrett's "supervisorial duties . . . made it likely that she remained involved in discretionary prosecutorial functions throughout the case." But the record contains no evidence that she was involved in any such activities other than those mentioned in the previous paragraph, and even if she was, such participation did not violate defendant's right to a fair trial.

■ In a footnote, defendant accuses his trial counsel of incompetence for not moving to disqualify the entire Stanislaus County District Attorney's Office on the ground that Chief Deputy Berrett was a material witness. But Berrett's testimony, which pertained only to tasks she performed in her official capacity with the district attorney's office, did not create a conflict of interest "that would render it unlikely that the defendant would receive a fair trial" (§ 1424) if the district attorney's office handled the prosecution. (See generally *People v. McPartland* (1988) 198 Cal.App.3d 569, 574 [243 Cal.Rptr. 752] ["recusal of an entire district attorney's office is not a step to be taken lightly, even where one or more deputy district attorneys may be called as witnesses"]; *People ex rel. Younger v. Superior Court, supra,* 86 Cal.App.3d 180 [reversing trial court's order recusing district attorney's office because one attorney was a witness to photographic lineups].) Thus, there was no reason for defendant's trial counsel to make the motion in question.

### B. *Trial Court's Alleged Conflict of Interest*

At a pretrial hearing pertaining to a motion by defendant to strike certain prior felony convictions, the trial judge (Charles V. Stone), remarked in passing that he had represented defendant in one of the felonies, which resulted in a guilty plea. Neither party asked Judge Stone to disqualify

himself as a result of this disclosure. At trial, the prosecution did not use the prior conviction in which Judge Stone had represented defendant.

■ Defendant asserts that when Judge Stone represented him in the prior felony matter, the judge incurred a duty of loyalty to defendant that remained even after he became a judge. As a result, defendant argues, Judge Stone had a conflict of interest that violated defendant's right to an impartial judge, as guaranteed by the state and federal Constitutions. Defendant's failure to challenge Judge Stone or to seek review of the issue by a timely writ petition bars him from now raising this issue. (*People v. Brown* (1993) 6 Cal.4th 322, 335-336 [24 Cal.Rptr.2d 710, 862 P.2d 710]; see also *People v. Barrera* (1999) 70 Cal.App.4th 541, 547-552 [82 Cal.Rptr.2d 755].)

Even if defendant had preserved the issue, he would not be entitled to relief. If anything, Judge Stone's duty of loyalty to defendant would have made it difficult for him to be fair to the *prosecution*, not to defendant. Defendant speculates that Judge Stone may have been prejudiced against him because, while representing him, Stone may have learned prejudicial information about him that was not introduced at trial. The record, however, contains no evidence that Judge Stone knew of any such information.

Finally, we reject defendant's contention that his trial attorneys were incompetent for not moving to disqualify Judge Stone based on his prior representation of defendant. Defense counsel may have reasonably concluded that this circumstance would not bias him against defendant and would, if anything, make him a *more* sympathetic arbiter.

## C. *Sufficiency of Voir Dire*

Defendant contends that during voir dire the prospective jurors were not adequately questioned to determine whether their attitudes regarding capital punishment would " 'prevent or substantially impair' " their ability to determine whether defendant should be sentenced to death. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) He claims the trial court conducted a "perfunctory" and "cursory" inquiry into the prospective jurors' views on capital punishment by asking "leading questions unlikely to uncover bias." On this issue, he notes, defense counsel posed no questions to 11 of the jurors who were chosen for the trial, and asked only one question of the 12th juror. As a result, he claims, he was not tried by an impartial jury, as required by the Sixth and Fourteenth Amendments to the federal Constitution, and the jury's penalty decision did not satisfy his Eighth Amendment right to a reliable penalty determination.

■ To the extent defendant contends the *trial court* inadequately questioned prospective jurors on their attitudes toward the death penalty, he has

not preserved the issue for appeal because he did not object on this ground at trial. (*People v. Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) ▉ In any event, the court adequately questioned the prospective jurors. Following a procedure recommended by this court in *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], the court questioned the jurors individually and in sequestration. After asking prospective jurors to describe their views on the death penalty, the court asked whether they would automatically convict defendant so they could get to the penalty stage or would automatically find the special circumstance allegations not true to avoid the question of penalty; whether they would in every case vote to impose the death penalty or would in every case vote to impose a sentence of life without possibility of parole; and whether they had moral, religious, or philosophical beliefs that would impair their ability to decide the case. Counsel were then permitted to ask follow-up questions. There was no constitutional violation in this procedure. (See *People v. Avena, supra,* 13 Cal.4th at p. 413.)

▉ Defendant also appears to claim his trial attorneys were incompetent because, with one exception, they asked no follow-up questions of the prospective jurors who were later selected for the trial, to further probe their attitudes on the death penalty. But counsel *did* ask follow-up questions to other prospective jurors who were not selected. In not questioning the prospective jurors who were later chosen to serve on the jury, defense counsel may well have made a reasonable tactical decision. We find no evidence of incompetence. (See generally *People v. Memro* (1995) 11 Cal.4th 786, 818-819 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 587 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People v. Lewis* (1990) 50 Cal.3d 262, 289-290 [266 Cal.Rptr. 834, 786 P.2d 892].)

### D. *Trial Court's Restriction on Defendant's Cross-examination of Prosecution Witnesses*

Defendant claims the trial court improperly restricted his cross-examination of certain prosecution witnesses, thereby violating state law as well as the state and federal Constitutions. Specifically, he argues he should have been permitted to ask questions on three subjects: whether the prosecution made offers of leniency in exchange for the testimony of witness Ybarra; whether Ybarra was using drugs at the time he testified; and whether Ybarra had information about the murder of Esther Alvarado before he told deputies that he had heard defendant, Alfredo Padilla, and Brenda Prado conspiring to commit the crime. We address each of these claims below.

### 1. *Offers of leniency to Ybarra*

The defense theory was that prosecution witness Ybarra had falsely implicated defendant in the murder of Esther Alvarado so he would not be prosecuted for the theft of Johnny Alvarado's lawn mower. Both Ybarra and Holly Berrett, Chief Deputy in the Stanislaus County District Attorney's Office, testified that no such agreement had been made. Berrett explained that Ybarra had not been charged with the theft because, although Ybarra was initially a suspect, Detective Nirschl had concluded after further investigation that Ybarra's brother Gilbert had stolen the lawn mower without Ybarra's help.

During defendant's cross-examination of Ybarra, this exchange occurred:

Q: "So now when you had been talking with Detective Nirschl were you worried at all about being charged with receiving stolen property, helping to sell stolen property?"

A: "No sir."

Q: "You hadn't thought about that one?"

A: "I wasn't worried."

Q: "You weren't worried because your brother was going to say it was all his doing, right?"

The trial court sustained the prosecutor's objection to this question as argumentative.

Defendant argues the trial court should have overruled the objection, claiming it unfairly restricted his attempt to show that Ybarra's lack of concern was based on an undisclosed deal with the prosecution. We disagree. Ybarra had already testified that he did not steal the lawn mower, and that he had told his brother not to blame him for the theft. Defendant merely asked whether Ybarra believed his brother would admit that he stole the lawn mower without Ybarra's help, a question which had little or no bearing on whether the prosecution had made a deal with Ybarra.

Later, when defendant tried to ask Detective Nirschl whether he considered Ybarra's apology to Johnny Alvarado for the theft of his lawn mower to be evidence that Ybarra had participated in the crime, the trial court sustained the prosecutor's objection that the question "called for a conclusion."

The court also sustained the prosecutor's relevancy objection when defendant asked Detective Nirschl whether Detective DeLeon, who had also talked to Ybarra, was "excited" when he commented to Nirschl that Ybarra's statement provided grounds for charging defendant with a financial gain special circumstance. Defendant argues these questions were proper because they were likely to elicit evidence tending to show that the two detectives believed that Ybarra had participated in the theft of the lawn mower and that they had an incentive to make a bargain with him. The questions, however, were only marginally relevant to the underlying issue of whether the prosecution actually had such an agreement with Ybarra. Thus, assuming for the sake of argument that the trial court should have overruled the prosecutor's objections, the error was harmless under any standard of prejudice.

### 2. *Ybarra's drug use*

■ In an effort to show that prosecution witness Ybarra was still using heroin at the time he testified, defense counsel, who apparently noticed Ybarra's sniffling, asked on cross-examination whether he had a cold. When Ybarra blamed the sniffles on the weather, counsel asked if he was still using heroin; Ybarra replied he was not. Counsel then asked if Ybarra got sniffles when he used heroin. The trial court sustained the prosecutor's objection to the last question as argumentative. Three days later, still during cross-examination, counsel asked if Ybarra still had a cold. The prosecutor objected without stating a ground, and the trial court sustained the objection.

In sustaining these two objections, defendant argues, the trial court deprived him of the opportunity to undermine Ybarra's testimony by showing that he was using drugs when he testified. We disagree. Ybarra had denied he was using drugs, and the questions by the defense were purely rhetorical, implying that Ybarra's sniffles were a result of drug use, not a cold, and that by insisting on the latter Ybarra was lying. Moreover, even if the trial court should have permitted the questions, the error was harmless, because the jury knew that Ybarra had used drugs in the past, and whether he was using them at the time of trial was only tangentially relevant to his veracity as a witness.

### 3. *Information about the murder of Esther Alvarado*

Defense counsel asked prosecution witness Ybarra on cross-examination whether "the people in Grayson were talking about [Alvarado's murder] a lot" on the day after it took place. The trial court sustained the prosecutor's relevancy objection.

Defendant insists the question was relevant and should have been allowed. He explains that if the residents of Grayson were talking about Alvarado's

murder, Ybarra could thus have learned details about the murder from them, instead of through a conversation among defendant, Padilla, and Prado, that Ybarra claimed to have overheard. Assuming for the sake of argument that defendant is correct, the error was harmless. Ybarra testified that he had heard about the killing from Esther Alvarado's brother and a friend and that he had read about it in the newspaper. Thus, the jury knew Ybarra could have learned details of the murder from these sources; whether he had also discussed it with other people in Grayson was of minimal significance.

### 4. *Confrontation clause*

Defendant asserts that by sustaining the above discussed prosecutorial objections to his cross-examination of prosecution witnesses Ybarra and Detective Nirshl, the trial court violated his constitutional right to confront adverse witnesses. (U.S. Const., 6th & 14th Amends.) We disagree. "The confrontation clause allows 'trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (*People v. Clair* (1992) 2 Cal.4th 629, 656, fn. 3 [7 Cal.Rptr.2d 564, 828 P.2d 705], quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674]; see also *People v. Hines* (1997) 15 Cal.4th 997, 1047 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Here, the challenged rulings all pertained to marginally relevant matters; defendant had ample opportunity to cross-examine Ybarra to probe his veracity.

### E. *Sufficiency of Evidence of Financial Gain Special Circumstance*

The jury found true the special circumstance allegation that defendant killed Esther Alvarado for "financial gain," that is, heroin and cocaine he got from Alfredo Padilla and Brenda Prado for committing the murder. Defendant argues the evidence was insufficient to support the financial gain special circumstance. To evaluate this claim, we must "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Although there was strong circumstantial evidence *identifying* defendant as the one who killed Esther Alvarado, the only evidence that the killing was *in exchange for illegal drugs*, and thus the only evidence supporting the financial gain special circumstance, was the testimony of prosecution

witness Ybarra, who said he overheard defendant plotting with Alfredo Padilla and Brenda Prado to kill Alvarado.

Defendant contends Ybarra's testimony was chronologically impossible, for reasons discussed below.

Ybarra testified that he arrived at the Grayson house between *10:30* and *11:00 p.m.*; defendant arrived, after dropping off Esther Alvarado at the nearby Guzman's Bar, between *11:00 and 11:30 p.m.* Ybarra claimed he overheard defendant, Padilla, and Prado plot to kill Alvarado, after which defendant picked up Alvarado at Guzman's Bar and drove away. Lorenzo Guzman, the owner of the bar, corroborated Ybarra, testifying that Alvarado was in his bar for 15 or 20 minutes and left between *11:30 p.m. and midnight.* Ybarra also testified that after defendant left the Grayson house, Dallas White gave him a ride home.

On cross-examination, the defense impeached Ybarra with his preliminary hearing testimony that while White was taking him home, they drove by Johnny Alvarado's house and saw a sheriff's patrol car parked there, and Ybarra said to White that the sheriff's deputies must be questioning his brother Gilbert about the lawn mower stolen from Alvarado. (As previously mentioned, Gilbert had left the Grayson house with Alvarado after Alvarado had recovered the mower from Gilbert.) Similarly, Dallas White testified that when he drove Ybarra home the night of Esther Alvarado's murder, they saw a sheriff's car in front of Johnny Alvarado's house. There was also testimony by the deputy who arrested Gilbert that the deputy was at Johnny Alvarado's house from *9:20 p.m.* until approximately *10:30 p.m.*, and the "booking register" showed that he booked Gilbert into the county jail shortly thereafter, at *11:00 p.m.*

Defendant reasons that if Ybarra and White saw the sheriff's car at Johnny Alvarado's house, they must have driven by that house *before 10:30 p.m.* (when the sheriff's deputy said he left the house), in which case Ybarra could not have been at the Grayson house at *11:00 p.m.*, when Ybarra said defendant arrived. Therefore, defendant argues, Ybarra must have lied when he said he overheard defendant plotting the killing of Esther Alvarado with Padilla and Prado.

Not necessarily so. Ybarra may have been wrong in his time estimate when he testified that defendant arrived at the Grayson house between 11:00 and 11:30 p.m.; similarly, bar owner Guzman may have been wrong when he said Esther Alvarado left the bar between 11:30 and midnight. Neither Ybarra nor Guzman had any reason to pay close attention to the time when

the events in question occurred, and Ybarra did not have a watch. Thus, Ybarra may have overheard defendant conspiring with Padilla and Prado at about 10:00 p.m., which would have enabled him to see the sheriff's patrol car on his way home. Alternatively, Ybarra may have been right in his time estimate, but the car he and White saw on the way to Ybarra's house may not have belonged to the sheriff's deputy who arrested Gilbert. Either way, the jury could reasonably have concluded that Ybarra truthfully testified that he heard defendant, Padilla, and Prado planning to kill Alvarado.

Defendant claims that, in an interview with Detective DeLeon introduced at trial, Ybarra said he heard from Dallas White that defendant had plotted with Padilla and Prado to kill Esther Alvarado rather than overhearing the conversation himself. Defendant bases this claim on selective portions of an ambiguous and nearly incoherent comment Ybarra made at the beginning of the interview. Later in the interview, however, Ybarra explained that he personally heard defendant, Padilla, and Prado planning to kill Esther Alvarado.

Defendant argues that Ybarra was not credible because he was a heroin addict, a liar, a thief, and a police informant. Defendant also points to many minor discrepancies in Ybarra's testimony at defendant's trial, when compared to his statement to Detective DeLeon and his testimony in other court proceedings. But the jury knew of Ybarra's unsavory reputation and the inconsistencies in his testimony, and it nevertheless believed him. So did the trial court, which commented at the sentencing hearing that Ybarra's testimony was "credible despite some inconsistencies."

In evaluating the sufficiency of evidence, "the relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt" (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159]), but "whether ' "*any* rational trier of fact" ' could have been so persuaded" (*People v. Lucero* (1988) 44 Cal.3d 1006, 1020 [245 Cal.Rptr. 185, 750 P.2d 1342]). Here, a rational trier of fact could, relying on Ybarra's testimony, find that defendant killed Esther Alvarado in exchange for heroin and cocaine, thus supporting the special circumstance that the killing was for financial gain.

F. *Effect of Jury's Conspiracy Verdict*

As previously mentioned, defendant was charged not only with the murder of Esther Alvarado but also with conspiracy to commit murder. The prosecution alleged eight overt acts in furtherance of the conspiracy. The jury found only three of these acts true: that defendant met with Alfredo Padilla

and Brenda Prado on the night of January 4-5, 1988, that at the meeting he agreed to kill Esther Alvarado in exchange for drugs, and that he killed Alvarado in furtherance of the conspiracy. The jury did not find true the other five alleged overt acts: that defendant told Padilla and Prado he had left Alvarado at Guzman's Bar, that Padilla and Prado told defendant Alvarado was a "rat" who should be killed, that Padilla and Prado offered defendant drugs to kill Alvarado, that Padilla and Prado gave defendant drugs at the meeting, and that Padilla offered defendant a shotgun to use to kill Alvarado.

 Defendant notes that prosecution witness Ybarra's testimony provided the only evidence of each overt act that the jury did *not* find true. Therefore, he infers, the jury must have rejected Ybarra's testimony. As a result, he argues, the financial gain special circumstance cannot stand, because Ybarra's testimony provided the only evidence to support it.

We disagree. The jury's findings on the overt acts do not show that it rejected Ybarra's testimony. The jury may have decided not to find four of the alleged overt acts true because they involved conduct not by defendant but by Padilla and Prado, and the jury may have decided not to find true the fifth alleged overt act (that defendant told Padilla and Prado he had left Alvarado at the bar) because it preceded the conspiracy. Alternatively, the jury may have been unable to determine beyond a reasonable doubt that Ybarra correctly remembered *every detail* of the conspiracy to kill he overheard among defendant, Padilla, and Prado; but the jury credited the most significant part of Ybarra's testimony, namely, that defendant agreed to kill Alvarado in exchange for drugs. Another possibility is that the jury, which was instructed to convict defendant of conspiracy so long as it unanimously agreed that at least *one* overt act was true, decided that once it unanimously agreed on *three* overt acts, it did not have to decide whether the remaining five acts were true. If the jury relied on *any* of the theories described above, it did not reject Ybarra's testimony.

Even if the jury's findings on the alleged overt acts were inconsistent with its finding on the financial gain special circumstance, that inconsistency would provide no ground for overturning the special circumstance finding. (See generally *People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81] ["It is . . . settled that an inherently inconsistent verdict is allowed to stand . . . ."].)

G. *Constitutionality of Financial Gain Special Circumstance as Applied to This Case*

 Defendant contends the financial gain special circumstance is unconstitutional as applied to this case. He claims the prosecution's evidence

shows that he killed Esther Alvarado to obtain a "fix" to feed his heroin addiction. He maintains that when the only "financial gain" a defendant hopes to obtain from a murder are the drugs that will satisfy an addiction, the financial gain special circumstance fails to "genuinely narrow" the class of persons eligible for the death penalty, in violation of the Eighth and Fourteenth Amendments to the federal Constitution.

The Attorney General responds that defendant has not preserved this issue for appeal because he did not raise it at trial. But this court has consistently considered "as applied" challenges to California's death penalty law (such as this one) on their merits without discussing whether they were raised at trial. (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 691 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Kraft, supra,* 23 Cal.4th 978, 1078; *People v. Davenport* (1995) 11 Cal.4th 1171, 1225 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Garceau* (1993) 6 Cal.4th 140, 207 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Roberts* (1992) 2 Cal.4th 271, 323 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Here, we need not decide whether an objection was necessary to preserve the issue because, as we shall explain, defendant's claim lacks merit. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93] [when the question whether a defendant has preserved a claim is "close and difficult," we assume the claim is preserved and address the merits].)

Contrary to defendant's argument, there is no evidence that he killed Esther Alvarado simply to satisfy a drug addiction. Prosecution witness Ybarra testified that defendant agreed to commit the murder in exchange for both heroin and cocaine, but there was no evidence at the *guilt* phase of trial that he was addicted to either drug. To the contrary, when defendant was arrested he told Deputy Sheriff Richard McFarren that although he was beginning to have a drug problem, he was not an everyday user of drugs and did not have a drug habit. Defendant did present evidence at the *penalty* phase that he was addicted to *heroin*, but he offered no evidence that he was addicted to *cocaine*. Thus, even if we were to assume that the financial gain special circumstance does not apply to those who commit a murder solely to satisfy a drug habit, and even if we could consider evidence presented at the penalty phase in determining whether defendant had such an addiction, the evidence here did not show that this was defendant's only motive for killing Esther Alvarado.

In any event, we see no constitutional impediment to a capital punishment scheme that, like California's death penalty law, provides that persons who kill for "financial gain" are eligible for the death penalty, but does not exclude from that relatively broad category those who commit the murder to

obtain drugs to satisfy an addiction. Defendant argues that if the financial gain special circumstance encompasses murders committed by addicts in exchange for drugs, it precludes the jury from considering the murderer's addiction as a factor in mitigation. Not so. Nothing in California's death penalty scheme prevents a defendant from arguing that a murder committed to satisfy a drug habit is a mitigating circumstance warranting a sentence of life imprisonment without possibility of parole rather than death. Indeed, here defendant made precisely that argument to the jury.

### H. *Special Circumstance Finding on Conspiracy Conviction*

The jury convicted defendant not only of the first degree murder of Esther Alvarado, but also of conspiring to murder her, and it found the financial gain special circumstances true as to both the murder and the conspiracy to murder. The trial court sentenced defendant to life imprisonment without possibility of parole for the crime of conspiracy to commit murder.

Defendant argues that the special circumstances listed in section 190.2, including murder for financial gain, do not apply to the crime of conspiracy. This issue also arose in *People v. Lawley* (2002) 27 Cal.4th 102 [115 Cal.Rptr.2d 614, 38 P.3d 461]. There, the Attorney General conceded that our law did not authorize a special circumstance finding and death sentence for the crime of conspiracy to commit murder. (*Id.* at pp. 171-172; but see *id.* at p. 173 (conc. opn. of Baxter, J.) [stating that whether special circumstance allegations can accompany a charge of conspiracy to commit murder "presents a close and difficult question"].) Here, the Attorney General does not concede the issue. We therefore address its merits.

California's conspiracy law states that when two or more persons conspire to commit murder, "the punishment shall be that *prescribed for murder in the first degree.*" (§ 182, subd. (a), italics added.) The Legislature added that language a half-century ago. (Stats. 1955, ch. 660, § 1, p. 1155.) At that time, the punishment for murder was described in former section 190, which stated in pertinent part: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same; or upon a plea of guilty, the court shall determine the same . . . ." (Stats. 1927, ch. 889, § 1, p. 1952.) In 1955, therefore, the punishment for conspiracy to commit murder was death or life imprisonment, at the discretion of the jury or the court.

But defendant and the Attorney General both assume that the Legislature, when it said the punishment for conspiracy to commit murder "shall be that prescribed for murder in the first degree," did not intend to fix

the penalty permanently at the punishment for first degree murder as it existed in 1955, but rather intended to incorporate by reference changes in the penalty for first degree murder occurring after that time. We agree. "[W]here a reference to another law is specific, the reference is to that law as it then existed and not as subsequently modified, but where the reference is general, . . . the reference is to the law as it may be changed from time to time." (*People v. Anderson* (2002) 28 Cal.4th 767, 779 [122 Cal.Rptr.2d 587, 50 P.3d 368], citing *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58-59 [195 P.2d 1].) Because section 182 refers generally to the punishment prescribed for murder in the first degree, it incorporates whatever punishment the law prescribed for first degree murder when the conspiracy was committed.

The current law fixing the penalty for first degree murder was enacted by voter initiative in 1978. Subdivision (a) of section 190, enacted as part of that initiative, describes the punishment for first degree murder: "Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without the possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5." Subdivision (a) of section 190.2 states: "The penalty for a defendant who is found guilty of *murder in the first degree* is death or imprisonment in the state prison for life without the possibility of parole if one or more . . . special circumstances has been found . . . true . . . ." (Italics added.)

 Thus, current law prescribes death and life imprisonment without possibility of parole as punishments for first degree murder, but only when a special circumstance has been found true. Absent a special circumstance finding, the punishment for first degree murder is imprisonment for a term of 25 years to life. Because the punishment for conspiracy to commit murder is "the punishment . . . prescribed for murder in the first degree" (§ 182, subd. (a)), the punishment for conspiracy to commit murder can be death or life imprisonment without parole only if a special circumstance may be alleged and found true as to that crime.

Whether the special circumstances in section 190.2 apply to the crime of conspiracy to murder is a question of statutory construction. In construing statutes, we seek to ascertain and effectuate legislative intent. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) We begin with the text of statutes because the words used are generally the most reliable indicator of legislative intent. (*Ibid.*)

 We find nothing in the wording of the statutes governing special circumstances indicating that the voters who enacted the 1978 death penalty

law intended that the special circumstances would apply to the crime of conspiracy to commit murder or indeed to any crime other than murder. The crime of conspiracy to commit murder is nowhere mentioned in the text of the 1978 death penalty initiative measure, and the initiative's provisions rather strongly imply that special circumstances may be charged and found true only as to the crime of murder. For example, subdivision (a) of section 190.1 states: "*If the trier of fact finds the defendant guilty of first degree murder,* it shall at the same time determine the truth of all special circumstances charged . . . ." (Italics added.)

We assume the electorate understood that application of special circumstances to the crime of conspiracy to murder would have practical significance only when the conspirators did not succeed in killing their intended victim. If they did kill the victim, the conspirators could be charged with murder, and the special circumstance could be alleged for that crime. The prosecution would gain no apparent advantage in charging special circumstances also as to the separate of crime of conspiracy to murder. Under section 654, a defendant may not be punished for both the murder and the conspiracy (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 819 [179 Cal.Rptr. 726]); in any event, the punishments of death and life without possibility of parole may only be imposed on a defendant once. Thus, the 1978 electorate would have no reason to want the special circumstances adopted by the 1978 initiative to be applicable to a *successful* conspiracy to commit murder. ▉ We consider, then, whether there is any basis to conclude that the electorate intended to make capital punishment available for those engaged in an *unsuccessful* conspiracy to commit murder.

To determine the voters' intent, we consider the analyses and arguments in the official ballot pamphlet for the election at which the 1978 death penalty initiative was adopted. (See *People v. Rizo* (2000) 22 Cal.4th 681, 685 [94 Cal.Rptr.2d 375, 996 P.2d 27]; *People v. Birkett* (1999) 21 Cal.4th 226, 243 [87 Cal.Rptr.2d 205, 980 P.2d 912].) Like the text of the initiative itself, the analyses and arguments in the official ballot pamphlet for the election at which the 1978 death penalty initiative was adopted contain no mention of the crime of conspiracy to commit murder and no suggestion that the special circumstances enumerated in section 190.2 would apply to the crime of conspiracy to commit murder or to any crime other than murder.

Another aid in determining legislative intent is "the history and background of the measure" (*People v. Birkett, supra,* 21 Cal.4th at p. 232), including "the wider historical circumstances of its enactment" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; accord, *County of Santa Clara v. Perry* (1998)

18 Cal.4th 435, 442 [75 Cal.Rptr.2d 738, 956 P.2d 1191]). In 1978, when the electorate adopted the current death penalty law, it was unclear whether the federal Constitution permitted imposition of the death penalty for the crime of conspiracy to murder. Just the preceding year, in *Coker v. Georgia* (1977) 433 U.S. 584 [97 S.Ct. 2861, 53 L.Ed.2d 982] (*Coker*), six justices of the United States Supreme Court had held that imposing the death penalty for rape was cruel and unusual punishment, in violation of the Eighth Amendment to the federal Constitution. (*Coker*, at p. 592 [97 S.Ct. at p. 2866] (plur. opn. of White, J.); *id.* at p. 600 [97 S.Ct. at p. 2870] (conc. opns. of Brennan, J. & Marshall, J.).) Although the high court did not expressly hold that the Eighth Amendment prohibits capital punishment for *all* crimes not resulting in death, the plurality stressed that the crucial difference between rape and murder is that a rapist "does not take human life." (*Coker,* at p. 598 [97 S.Ct. at p. 2689].) The same day on which it decided *Coker*, the high court, in a one-paragraph per curiam opinion, vacated a death sentence for the crime of aggravated kidnapping, stating that the sentence was cruel and unusual punishment. (*Eberheart v. Georgia* (1977) 433 U.S. 917 [97 S.Ct. 2994, 53 L.Ed.2d 1104].)

We assume the electorate is aware of relevant judicial decisions when it adopts legislation by initiative. (*People v. Clark* (1990) 50 Cal.3d 583, 602 [268 Cal.Rptr. 399, 789 P.2d 127]; *People v. Burton* (1989) 48 Cal.3d 843, 861 [258 Cal.Rptr. 184, 771 P.2d 1270].) Thus, we assume that in 1978, when it adopted the current death penalty law, the California electorate was aware of the United State Supreme Court's then recent decisions in *Coker, supra,* 433 U.S. 584, and *Eberheart v. Georgia, supra,* 433 U.S. 917, raising serious doubts that the federal Constitution permitted the death penalty for any offense not requiring the actual taking of human life. It is reasonable to infer that the electorate, having this knowledge, intended to ensure the constitutionality of death penalty law by restricting capital punishment to the crime of first degree murder. Further, it is reasonable to infer that the electorate intended to accomplish this restriction by authorizing the special circumstances that would establish eligibility for capital punishment only for murder in the first degree, as indicated by the wording of subdivision (a) of section 190.1 stating that a trier of fact would determine the truth of a special circumstance allegation only "[i]f the trier of fact finds the defendant guilty of first degree murder . . . ."

We also assume the voters are aware of punishments for comparable California crimes when they adopt punitive legislation. In November 1978, when the initiative death penalty law was enacted by the electorate, the penalty for most forms of *attempted willful and premeditated murder* was five, six, or seven years. (Former § 664, subd. 1, as amended by Stats. 1976,

ch. 1139, § 265, p. 5137; see §§ 187, 189, former § 190, as added by Stats. 1977, ch. 316, § 5, p. 1256.) September 1978 legislative amendments had increased that punishment, effective January 1, 1979, but only to five, seven, or nine years (former § 664, subd. (1), as amended by Stats. 1978, ch. 579, § 27, p. 1986; Stats. 1978, ch. 1166, § 2, p. 3771). Years later, the Legislature further increased the punishment for attempted willful and premeditated murder, but only to life imprisonment with the possibility of parole (former § 664, subd. (1), as amended by Stats. 1986, ch. 519, § 2, p. 1859), where it remains today. (§ 664, subd. (a).)

Though conspiracy is often punished more severely than attempt, it seems unlikely the voters intended to allow the death penalty for a conspiracy to murder, which requires only a conspirator's overt act in furtherance of the murderous plot (§ 184), at a time when the maximum punishment for attempted willful and premeditated murder, which requires a direct, though ineffectual, premeditated murderous act (§ 21a), was five, seven, or nine years in prison. This further supports our conclusion that the special circumstances in section 190.2 do not apply to conspiracy to murder.

Two additional rules of statutory construction also favor the conclusion that the special circumstances adopted by the 1978 death penalty law do not apply to crimes, like conspiracy to commit murder, that do not require the actual taking of human life. When determining the scope of an initiative, we "assume that the voters intended the measure to be valid and construe it to avoid 'serious' doubts as to its constitutionality if that can be done 'without doing violence to the reasonable meaning of the language.' " (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 581 [7 Cal.Rptr.2d 245, 828 P.2d 147].) Here, a construction of the 1978 death penalty law as permitting capital punishment for an offense like conspiracy to commit murder that does not require the actual taking of human life would raise a serious constitutional question. Since the United States Supreme Court's 1977 decisions in *Coker, supra,* 433 U.S. 584, and *Eberheart v. Georgia, supra,* 433 U.S. 917, there have been no executions in this country for crimes that did not involve the victim's death. (See Note, *What if the Victim Is a Child? Examining the Constitutionality of Louisiana's Challenge to Coker v. Georgia* (2000) 2000 Ill. L.Rev. 347, 360.) As a result, whether the federal Constitution bars imposition of the death penalty for crimes not resulting in death remains an unresolved issue. (See *State v. Polk* (La. 1979) 376 So.2d 151 [relying on *Coker* and *Eberheart* to invalidate law imposing the death penalty for aggravated kidnapping]; *State v. Gardner* (Utah 1997) 947 P.2d 630 [relying on *Coker* to invalidate law imposing the death penalty for aggravated assault by a prisoner serving a sentence for a "felony of the first degree"]; but see *State v. Wilson* (La. 1996) 685 So.2d 1063 [distinguishing *Coker* to uphold law imposing the death penalty for rape of a child

under the age of 12].) The issue continues to be the subject of considerable scholarly debate. (See, e.g., Note, *Murdering Innocence: The Constitutionality of Capital Child Rape Statutes* (2003) 45 Ariz. L.Rev. 197; Broughton, *"On Horror's Head Horrors Accumulate": A Reflective Comment on Capital Child Rape Legislation* (2000) 39 Duq. L.Rev. 1; Note, *What if the Victim Is a Child? Examining the Constitutionality of Louisiana's Challenge to Coker v. Georgia, supra,* 2000 Ill. L.Rev. 347; Fleming, *Louisiana's Newest Capital Crime: The Death Penalty for Child Rape* (1999) 89 J. Crim. L. & Criminology 717; Bailey, *Death Is Different, Even on the Bayou: The Disproportionality of Crime and Punishment in Louisiana's Capital Child Rape Statute* (1998) 55 Wash. & Lee L.Rev. 1335; Higgins, *Is Capital Punishment for Killers Only?* (Aug. 1997) 83 A.B.A. J. 30; Comment, *Coker v. Georgia: Disproportionate Punishment and the Death Penalty for Rape* (1978) 78 Colum. L.Rev. 1714; Comment, *Death Penalty for Rape* (1977) 91 Harv. L.Rev. 123.)

A survey published by the Bureau of Justice Statistics, the statistical agency of the United States Department of Justice, lists *no state* with a law allowing the death penalty for conspiracy to murder. But several states, as well as the federal government, have laws authorizing the death penalty for other crimes that do not necessarily involve the victim's death, such as treason, espionage, air piracy, aggravated kidnapping, and rape of a child. (Snell & Maruschak, Capital Punishment 2001, Bur. of Justice Statistics Bull., Dec. 2002, p. 2, <http://www.ojp.usdoj.gov/bjs/pub/pdf/cp01.pdf> [as of June 2, 2003].)

Because the constitutionality of laws imposing the death penalty for crimes not necessarily resulting in death is unresolved, and because we do not know of any state that allows a sentence of death for conspiracy to murder, we are reluctant to find that the electorate intended to authorize the death penalty for that offense absent clear evidence, of which we have found none, of that intent.

 The last rule of statutory construction we consider is known as the rule of lenity. This rule states that when "two reasonable interpretations of the same provision stand in relative equipoise, i.e., . . . resolution of the statute's ambiguities in a convincing manner is impracticable," we construe the provision most favorably to the defendant. (*People v. Jones* (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165]; see also *People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) Here, as we have seen, the 1978 death penalty law is most plausibly construed as not authorizing the charging of special circumstances for the crime of conspiracy to commit murder. But even if such a construction were no more

plausible than the alternative, the rule of lenity would add decisive weight in favor of that construction.

Accordingly, we hold that under sections 182 and 189 through 190.2, the punishment for conspiracy to commit murder is the punishment for first degree murder without special circumstances.

### III. Penalty Phase Issues

#### A. Admission of Evidence of Crime of Which Defendant Had Been Acquitted

In a discussion in chambers before the penalty phase began, the prosecutor told the trial court he intended to offer evidence that defendant, while in custody awaiting trial, stabbed Deputy Sheriff William Legg. The prosecutor said defendant had been charged with assault with a deadly weapon on two persons—Deputy Legg and inmate Kenny Mitchell—and that a jury had acquitted defendant of assaulting Mitchell with a deadly weapon but found him guilty of the lesser included offense of assault on Legg. The Attorney General now concedes that this representation was untrue. The jury had actually acquitted defendant of assaulting *Legg* with a deadly weapon while convicting him of the lesser offense of assault on *Mitchell*.[3]

Based on the prosecutor's inaccurate representation, the trial court permitted him to introduce evidence of defendant's assault on Deputy Legg. The latter testified to seeing defendant holding a four- to-six-inch-long piece of metal that had a piece of cloth wrapped around the middle, and receiving "two small stab wounds" from the weapon.

In closing argument, the prosecutor told the jury: "What's [defendant] like in jail? Well, ask Deputy Legg. . . . [Defendant] either acquires or makes what Legg defines for you as a shank, a jail-made knife, and Legg walks up and sees it in the defendant's hand. He confronts him about it and gets cut. Admittedly not major injuries, luckily. This is the man whose choice you have to send him to prison with other prisoners and guards for the rest of his life. What do you expect from him? What has he brutally taught you as part of this community that he is all about? . . . He'll get himself some dope in prison and you know he can. . . . And if he accesses some of the . . . gangs, that have a readily accessible reliable, repeated supply source to the

---

[3]We previously granted defendant's request that we take judicial notice of the minute order in Stanislaus County Superior Court file, case No. 246029, which demonstrates the inaccuracy of the prosecutor's statement. (See Evid. Code, §§ 452, subd. (d) [judicial notice may be taken of the records of any court of this state], 452.5 [pertaining to court records relating to criminal convictions]; *People v. Lawley, supra,* 27 Cal.4th 102, 163, fn. 24.)

. . . dope, . . . all he has got to do is pay the piper just like he has already paid Brenda Prado and Alfredo Padilla with services instead of money. [¶] It is nice, you've got a knack for acquiring or making jail-made knives, that's helpful. That's all he has got to do."

Later, in his rebuttal, the prosecutor also mentioned the assault on Legg in response to defense counsel's reference to the educational programs in which defendant had participated while at the California Youth Authority: "Contrast [the educational programs] with stabbing one of his guards, one of his jailers, cutting them with a shank. Which do you think is more significant? Which do you think tells you more about the individual? That . . . he may . . . have been cajoled . . . into an educational program . . . ? . . . [¶] Or a man . . . facing a first degree murder charge and a special circumstance allegation . . . and in the face of that, knowing that that's coming up . . . . , he's got a shank in his hand and he cuts his jailer. [¶] What tells you more about the man?"

■ Defendant contends the trial court should have excluded all evidence of his attack on Deputy Legg and the prosecutor should not have relied on that attack in his argument to the jury. We agree. Section 190.3 provides that "in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted." This section applies here because defendant was "prosecuted and acquitted" of assaulting Legg.

Defendant did not object to the evidence of the attack on Deputy Legg or to the prosecutor's argument. But his failure to do so was excusable, in light of the prosecutor's inaccurate representation to the trial court that defendant had been convicted of the assault. Thus, the Attorney General does not contend that defendant has forfeited the claim by lack of objection, and we need not consider defendant's alternative claim that counsel was incompetent for not objecting.

We discuss the prejudicial effect of the prosecution's use of the evidence that petitioner stabbed Deputy Legg in part III.E., *post.*

B. *Admission of Evidence That Caseri Feared Defendant Was Going to Kill Him*

At the penalty phase of trial, the prosecution introduced evidence that defendant had committed the uncharged murder of Caseri. As part of that evidence, Caseri's sister, Karen Hatcher, testified over defense objection that a week before Caseri's disappearance he told her of his fear that defendant,

Earl Rodrigues, and Arnulfo DeLeon were going to kill him; and he again said so at lunch with her two days later. Hatcher further testified, also over objection, that after Caseri disappeared she spoke to bartender Sal Banda at the Red Lion Cocktail Lounge. Banda said that on the last night Caseri was seen alive, Banda had offered to take him to the hospital after defendant had beaten him up, but Caseri refused to go, saying that defendant and Rodrigues were "going to get" him anyway.

■■■ Defendant contends the trial court should not have admitted Hatcher's testimony. We agree.

Caseri's statements to Hatcher and to Banda may have been relevant to prove that defendant killed him, but for that purpose they were inadmissible hearsay. (*People v. Noguera* (1992) 4 Cal.4th 599, 620-621 [15 Cal.Rptr.2d 400, 842 P.2d 1160] (*Noguera*); *People v. Armendariz* (1984) 37 Cal.3d 573, 588 [209 Cal.Rptr. 664, 693 P.2d 243]; Evid. Code, § 1250, subd. (b).) The Assembly Judiciary Committee's official comments to Evidence Code section 1250 mention inadmissibility of a murder victim's expressed fear of the person charged with the murder when the purpose is to prove the killer's identity. According to these comments, *People v. Merkouris* (1959) 52 Cal.2d 672 [344 P.2d 1], an early decision of this court that allowed such evidence, "is based on a rationale that destroys the very foundation of the hearsay rule." (Assem. Judiciary Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, pp. 280-282.) The Attorney General, however, argues the statements were admissible for a different purpose: to prove Caseri's state of mind. As we shall explain, he is wrong.

■■■ Subdivision (a) of Evidence Code section 1250 permits hearsay evidence of a declarant's state of mind when "the declarant's state of mind . . . is itself an issue in the action" or when it is "offered to prove or explain acts or conduct of the declarant." A prerequisite to this exception to the hearsay rule is that the declarant's mental state or conduct be factually relevant. (*Noguera, supra,* 4 Cal.4th at p. 620; see also *People v. Ruiz* (1988) 44 Cal.3d 589, 608 [244 Cal.Rptr. 200, 749 P.2d 854].) A murder victim's fear of the alleged killer may be in issue when the victim's state of mind is directly relevant to an element of an offense. (See, e.g., *People v. Thompson* (1988) 45 Cal.3d 86, 103-104 [246 Cal.Rptr. 245, 753 P.2d 37] [decedent's fear of the defendant relevant to refute the defendant's claim that they engaged in *consensual* sexual intercourse before her death, and thus to prove an alleged rape-murder special circumstance].) That fear may also be in issue when, according to the defendant, the victim has behaved in a manner inconsistent with that fear (see, e.g., *People v. Lew* (1968) 68 Cal.2d 774, 778-780 [69 Cal.Rptr. 102, 441 P.2d 942] [decedent's fear relevant to

disprove the defendant's claim that she was sitting on his lap and examining his gun when it accidentally discharged]). ▮ Here, however, neither murder victim Caseri's mental state nor his conduct was an issue in the case.

The Attorney General contends that Caseri's fear of defendant was relevant to explain why Caseri remained at the Red Lion Cocktail Lounge after defendant attacked him. Caseri's alleged fear does raise a *question* as to why he remained at the Red Lion, but it provides no answer to that question. Moreover, the reason why Caseri remained at the Red Lion was not at issue. The only issue was whether defendant or someone else had killed Caseri. In previous decisions, we have repeatedly rejected similar claims by the Attorney General that the victim's fear of the defendant was relevant to the victim's state of mind or conduct. (See, e.g., *Noguera, supra,* 4 Cal.4th at p. 622 [victim's state of mind and conduct not in issue when the only issue was defendant's identity]; *People v. Ruiz, supra,* 44 Cal.3d at p. 608 [victims' state of mind and conduct not in issue]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1204 [249 Cal.Rptr. 71, 756 P.2d 795]; *People v. Armendariz, supra,* 37 Cal.3d at pp. 584-588; *People v. Arcega* (1982) 32 Cal.3d 504, 526-527 [186 Cal.Rptr. 94, 651 P.2d 338]; *People v. Ireland* (1969) 70 Cal.2d 522, 529 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

We consider the prejudicial effect of the trial court's erroneous admission of Hatcher's testimony in part III.E., *post.*

C. *Failure to Instruct on Accomplice Liability*

As mentioned earlier, Earl Rodrigues (defendant's brother-in-law) testified for the prosecution, and the prosecution also introduced out-of-court statements Rodrigues had made to Patterson Police Officer Tony Zavala. The prosecution used Rodrigues's testimony and statements to show that defendant was drinking with Caseri the last night he was seen alive; that threats were exchanged between defendant and Caseri; that in a fight with Caseri outside the Red Lion Cocktail Lounge, defendant slammed Caseri's head onto the pavement; that Caseri later left the lounge with defendant; and that defendant used Rodrigues's car that evening.

▮ Defendant argues that Rodrigues may have been an accomplice to Caseri's murder, and the trial court should therefore have given the standard instructions on accomplices: CALJIC No. 3.10 (accomplice defined), CALJIC No. 3.11 (accomplice testimony must be corroborated), CALJIC No. 3.12 (sufficiency of evidence to corroborate an accomplice), and CALJIC No. 3.18 (jury should view accomplice testimony with distrust).

▮ As we explained in *People v. Mincey* (1992) 2 Cal.4th 408, 461 [6 Cal.Rptr.2d 822, 827 P.2d 388]: "When the prosecution calls an accomplice

as a witness, the trial court must instruct the jury that the witness's testimony should be viewed with distrust. [Citation.] This rule applies to both the penalty and the guilt phases of a death penalty case. [Citation.] In addition, when the prosecution seeks to introduce evidence of the defendant's unadjudicated prior criminal conduct, the jury should be instructed at the penalty phase that accomplice testimony must be corroborated." (See also *People v. Williams* (1997) 16 Cal.4th 153, 275 [66 Cal.Rptr.2d 123, 940 P.2d 710]; *People v. Varnum* (1967) 66 Cal.2d 808, 814-815 [59 Cal.Rptr. 108, 427 P.2d 772].) ■ Although defendant here apparently did not request the instructions, we have held that when the prosecution uses accomplice testimony at the penalty phase of a capital case to show that the defendant has engaged in violent criminal acts, the trial court must give the instructions on its own initiative, unless the defendant has been convicted of the crime to which the penalty phase testimony pertains. (*People v. Williams, supra*, 16 Cal.4th at pp. 275-276; *People v. Mincey, supra*, 2 Cal.4th at p. 461; see also *People v. Tobias* (2001) 25 Cal.4th 327, 331 [106 Cal.Rptr.2d 80, 21 P.3d 758].)

■ The Attorney General contends the jury could not have found that Rodrigues was an accomplice to Caseri's killing, so the accomplice instructions were unnecessary. We disagree. Apart from the statements of Rodrigues himself, most of the evidence pointing to defendant as Caseri's killer applied equally to Rodrigues: (1) Before Caseri died he told his sister (Karen Hatcher) and Red Lion bartender Sal Banda that defendant *and Rodrigues* were going to kill him;[4] (2) Rodrigues, like defendant, was with Caseri the last time he was seen alive; (3) Rodrigues accompanied defendant outside the Red Lion bar when defendant attacked Caseri; (4) Rodrigues was related to defendant by marriage to his sister, and transported him to and from the bar where Caseri was last seen; (5) the prosecution hypothesized that Rodrigues's car was used to take Caseri's body to the canal where it was found; bloodstains were found in the car, and Rodrigues's brother removed the rear seat (which would have been bloody if it had been used to transport Caseri) before the police could examine it. Indeed, the jury was told that Rodrigues, like defendant, was arrested for the murder of Caseri, although the district attorney's office did not file charges against either of them.

This evidence was insufficient to show that Rodrigues was an accomplice as a matter of law. Nor did it establish *beyond a reasonable doubt* that Rodrigues helped to kill Caseri. It was enough, however, to permit a jury to conclude by a preponderance of the evidence that Rodrigues was an accomplice, in which event the jury would have to apply the rule that accomplice testimony must be corroborated and must be viewed with distrust. By not

---

[4]As explained in part III.B., *ante,* this evidence was inadmissible.

giving the requisite instructions on accomplice testimony, the trial court erred. We discuss the prejudicial effect of this error in part III.E., *post*.

### D. *Jury Instruction Pertaining to Others Involved in Criminal Activity with Defendant*

 At the penalty phase, the trial court read to the jury an instruction based on CALJIC No. 2.11.5: "There has been evidence in this case indicating that a person other than defendant was or may have also been involved in the criminal activity [in] which the defendant is alleged to have been involved. [¶] There may be many reasons why such person is not here on trial. Therefore, do not discuss or give any consideration to why the other person is not being prosecuted in this trial, whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved that the defendant was involved in such criminal activity."

Defendant asserts that the only person to whom this instruction pertained was prosecution witness Earl Rodrigues, who along with defendant was arrested for the murder of Caseri although, like defendant, he was never charged with the crime. Defendant argues that the trial court should not have given the instruction because Rodrigues testified, thus entitling the jury to consider why Rodrigues had not been prosecuted in evaluating his credibility as a witness.

The instruction was indeed improper. We have often said that trial courts should not give CALJIC No. 2.11.5 in an unmodified form when, as here, a person who might have been prosecuted for the crime has testified at trial. (*People v. Lawley, supra*, 27 Cal.4th at p. 162; *People v. Williams, supra,* 16 Cal.4th at pp. 226-227; *People v. Cain* (1995) 10 Cal.4th 1, 35 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Hardy* (1992) 2 Cal.4th 86, 190 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Price* (1991) 1 Cal.4th 324, 446 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Cox* (1991) 53 Cal.3d 618, 667 [280 Cal.Rptr. 692, 809 P.2d 351].) We consider the prejudicial effect of this error in part III.E., *post*.

### E. *Prejudice*

The prosecution witnesses at the penalty phase testified that defendant committed three crimes: the murder of Caseri, the stabbing of Deputy Legg, and the robbery of Mary Toste and her mother. (The prosecution also introduced documentary evidence that defendant had been convicted of

burglary.) As explained above, there was serious error regarding the evidence pertaining to the first two of these crimes.[5]

The evidence that defendant murdered Caseri was not overwhelming, as the prosecution implicitly acknowledged when it declined to prosecute defendant after his arrest for the crime. Given the weakness of the prosecution's case, the erroneously admitted evidence of Caseri's fear that defendant was going to kill him may have weighed heavily in the jury's determination whether defendant committed the murder. As this court rhetorically asked in *People v. Hamilton* (1961) 55 Cal.2d 881, 898 [13 Cal.Rptr. 649, 362 P.2d 473]: "How could this jury avoid the 'reverberating clang' of these accusations from the grave?" Our response: "The answer is that this is an impossible mental feat." (*Ibid.*; see also *People v. Coleman* (1985) 38 Cal.3d 69, 85-86 [211 Cal.Rptr. 102, 695 P.2d 189] ["[W]hen declarations pertaining to threats of future conduct by the accused are . . . admitted for the limited purpose of demonstrating the mental state of the declarant . . . 'it is impossible to limit the prejudicial and inflammatory effect of this type of hearsay evidence.' "].)

The prejudicial effect of the trial court's erroneous admission of Caseri's fear that defendant would kill him was compounded by the court's failure to give the jury the standard accomplice instructions as to prosecution witness Earl Rodrigues. The latter's observations, presented through his own testimony and his statements to Officer Tony Zavala, were crucial, because he was the only witness who saw defendant attack Caseri outside the Red Lion Cocktail Lounge; and he was the only witness who saw Caseri and defendant

---

[5] There may also have been serious error pertaining to the evidence of the robbery of Mary Toste and her mother. In a habeas corpus petition, defendant alleges his lead trial counsel, Kirk McAllister, a former deputy district attorney, had prosecuted him for the Toste robbery. McAllister may have intended that second counsel, Attorney Howard Tangle, would cross-examine Toste when she testified about the robbery at the penalty phase. When Tangle became ill, McAllister associated another attorney, Ramon Magana, to cross-examine Toste. But, defendant alleges, McAllister did not ask Magana to participate in the case until *the day before Toste was called as a witness,* and *Magana did not talk to defendant before Toste testified.* The record supports part of this claim: After Toste testified on direct examination, Magana made a highly unusual request for a five-minute recess before cross-examining so he could talk to defendant, explaining that he had not been able to meet with him. The trial court granted the request. On the record, defendant summarily waived "any conflict there may be" arising from Attorney McAllister's earlier involvement in prosecuting him for the Toste robbery, but McAllister merely mentioned that he was "involved in some of the Minute Orders" without explaining his role as prosecutor at the Toste robbery trial.

In his habeas corpus petition, defendant asserts that the representation by his attorneys pertaining to the robbery was incompetent, that Attorney McAllister had a conflict of interest with respect to the robbery, and that defendant's waiver of the conflict was invalid because he was not adequately advised of the nature of the conflict. Because we reverse defendant's judgment of death, we need not address these claims, which in any event could be considered only on habeas corpus.

leave the Red Lion together. The jury's evaluation of this evidence may well have been affected by the trial court's failure to instruct the jury that if it considered Rodrigues an accomplice it should regard his statements and testimony with suspicion.

Of less significance, but not to be ignored, is the trial court's erroneous instruction that the jury should not consider why Rodrigues was not being prosecuted for Caseri's murder. We have frequently said that a jury is not misled by this instruction when the trial court gives the standard instructions on accomplice liability. (See, e.g., *People v. Lawley, supra*, 27 Cal.4th at p. 162; *People v. Cain, supra*, 10 Cal.4th at p. 35; *People v. Price, supra*, 1 Cal.4th at pp. 445-446.) Here, however, the court did not give those instructions.

These errors, considered together, may have fatally distorted the jury's consideration of the prosecution's most important aggravating evidence: that defendant killed Caseri. Moreover, the trial court's erroneous admission of evidence that defendant stabbed Deputy Legg while awaiting trial may have further skewed the jury's penalty evaluation. The prosecutor effectively used evidence of that incident, of which defendant had been acquitted, to argue that if the jury returned a verdict of life imprisonment without possibility of parole, defendant would remain a danger to those around him and might well kill again.

When an error or a combination of errors occurs at the penalty phase of a capital case, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a different result if the error or errors had not occurred. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Here, the errors at the penalty phase were numerous and serious. There is a reasonable possibility that, considered together, they affected the jury's penalty determination.

Although they do not affect our disposition here, we also note with concern these facts: (1) An important prosecution witness at the penalty phase was cross-examined by a defense attorney who may have been retained only the previous day and apparently never spoke to defendant until after the witness testified on direct examination (see p. 876, fn. 5, *ante*); (2) although defendant's lead counsel had in a previous case prosecuted him for a robbery, evidence of which was introduced against defendant at the penalty phase, the record contains little evidence that defendant was made aware of the dangers and potential drawbacks of this possible conflict of interest (*ibid.*); (3) a prosecutor who was a potential witness and had already testified at a codefendant's trial conducted part of the voir dire of prospective jurors (see pt. II.A., *ante*); (4) the trial court violated its statutory duty

to have a court reporter present during bench conferences and the instruction conference (§ 190.9). In a death penalty case, we expect the trial court and the attorneys to proceed with the utmost care and diligence and with the most scrupulous regard for fair and correct procedure. The proceedings here fell well short of this goal.

## DISPOSITION

We vacate the special circumstance found true as to count II (conspiracy to commit murder) as well as the sentence of life without possibility of parole imposed for the conspiracy conviction. The judgment of death is reversed.

George, C. J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring.—I agree with affirming the murder and conspiracy convictions, affirming the weapon and special circumstance findings for the murder, but reversing the murder penalty judgment. I accept the majority's analysis of those issues.

I also agree that we should vacate the special circumstance finding as to the conviction for conspiracy to commit murder (Pen. Code, § 182, subd. (a); hereafter section 182(a)),[1] and the resulting sentence of life without parole on that count. For various reasons to which the majority allude, it is unclear that the voters, when adopting the 1978 initiative death penalty law, intended to apply its special capital punishment provisions not only to actual first degree murder, but also to the separate crime of conspiracy to commit murder.

I am particularly influenced by the disparity that would otherwise have arisen between the maximum punishment for conspiracy to commit murder on the one hand, and that provided in 1978 for attempted willful and premeditated murder on the other. (See maj. opn., *ante,* at pp. 867-868.) Under these circumstances, and particularly where the ultimate penalty of death is at stake, we should, as the majority suggest, apply the rule of lenity and give defendants the benefit of the doubt. As a result, under current law, the punishment for a conspiracy to commit murder, no matter how aggravated, is 25 years to life. (§§ 182(a), 190, subd. (a).)

I do wish to stress, however, that nothing the majority say forecloses the Legislature, or the electorate, from clearly providing that particular kinds of

---

[1]All further unlabeled statutory references are to the Penal Code.

aggravated murder conspiracies are subject to greater punishment, including death or life without parole. To support their conclusion that the voters who adopted the 1978 initiative death penalty law did not intend that result, the majority presume the voters were aware of two 1977 United States Supreme Court decisions, decided the same day, that may raise a question whether the death penalty is constitutional for crimes that do not involve the actual taking of human life. (*Coker v. Georgia* (1977) 433 U.S. 584 [97 S.Ct. 2861, 53 L.Ed.2d 982] (*Coker*); *Eberheart v. Georgia* (1977) 433 U.S. 917 [97 S.Ct. 2994, 53 L.Ed.2d 1104] (*Eberheart*).) But as the majority concede with good reason, *that issue is not resolved, and we do not resolve it here.* Indeed, in light of contemporary realities, there are substantial reasons to question whether the current high court would invalidate a carefully drafted statute that allowed death or life without parole for limited categories of aggravated murder conspiracies even when human life was not lost.

At the outset, the results in both *Coker* and *Eberheart* were skewed by the views of two members of that court that the death penalty is always unconstitutional. (See *Coker, supra,* 433 U.S. 584, 600 [97 S.Ct. 2861, 2870] (conc. opn. of Brennan, J.); *id.* at pp. 600-601 [97 S.Ct. at pp. 2870-2871] (conc. opn. of Marshall, J.).) In *Coker,* only four other justices appeared to conclude that the nonlethal crime there at issue—rape—could never support a death judgment. (*Id.* at pp. 586-600 [97 S.Ct. at pp. 2863-2870] (plur. opn. of White, J.).) A fifth left open the possibility that especially brutal and injurious rapes might qualify (*id.* at pp. 601-604 [97 S.Ct. at pp. 2870-2872] (conc. opn. of Powell, J.)), and two others concluded, at a minimum, that rape with a past record of capital crimes should qualify (*id.* at pp. 604-622 [97 S.Ct. at pp. 2872-2881] (dis. opn. of Burger, C. J., joined by Rehnquist, J.)). *Eberheart, supra,* 433 U.S. 917, a one-paragraph per curiam opinion, cited *Coker,* but provided no other clue why one may not be executed for the crime at issue in that case—aggravated kidnapping.

In the intervening quarter-century, the high court has not returned to the question of what crimes are constitutionally exempt from capital punishment. Of course there is little doubt, under the Eighth Amendment, that the extreme penalties of death and life without parole must be reserved for the most serious and heinous of offenses. But as recent events have demonstrated, murder conspiracies—which, by their nature, target human life—can rise to very high levels of danger and depravity.

Suppose an al Qaeda cell or antigovernment paramilitarists conspired to blow up the Golden Gate Bridge at rush hour, or the state capitol during business hours, seeking to kill everyone caught in the blast, but fortunately were thwarted as they lay in wait to detonate their explosive device. Suppose

a team of freeway snipers, operating in California with murderous intent, had wounded dozens, caused scores of dangerous auto accidents, and panicked the population of an entire region, but by pure luck had not succeeded in killing anyone. Suppose organized criminals, with the means to accomplish their goal, conspired and prepared, but ultimately failed, to assassinate numerous California judges, law enforcement officers, and witnesses who stood in the way of their racketeering or drug-running activities. Suppose White supremacists conspired and prepared to set an African-American church afire during Sunday services, but were prevented at the last minute from carrying out their plan. In my view, a carefully crafted statute providing capital penalties for such egregious conspiracies might well survive constitutional scrutiny.

The decision whether to adopt such a statute is for the Legislature or the voters. My comments here are intended only to dispel any notion, which might otherwise arise from the majority's decision, that an attempt to do so would face certain constitutional invalidation.

On August 13, 2003, the opinion was modified to read as printed above.