Filed 9/8/14  P. v. Mihajson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SEAN MICHAEL MIHAJSON,<br><br>    Defendant and Appellant. | G049905<br><br>(Super. Ct. No. INF062391)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Graham A. Cribbs, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Sean Michael Mihajson appeals from a judgment after a jury convicted him of first degree murder while committing a robbery. Mihajson argues the trial court erred in admitting evidence, the prosecutor committed misconduct during closing argument and alternatively, he received ineffective assistance of counsel, there was cumulative error, and there were two sentencing errors. We agree the trial court erred in admitting evidence but conclude Mihajson was not prejudiced. We also agree his sentence must be modified. His other claims are meritless, and we affirm the judgment as modified.

FACTS

Around March 2007, Mihajson, his twin sister Vanesa Mihajson (Vanesa), Katie Weddle, and her boyfriend, Herman Melendenz began living together in a three-bedroom condominium (the condo) in a senior living community despite the fact they were all young adults. Vanesa knew a real estate agent who leased the condo to her and Mihajson. Mihajson drove a Cadillac and a Chrysler 300, and Vanesa drove a white minivan.

After Weddle and Melendez ended their relationship and Melendez moved out, Mihajson and Weddle began dating, and Weddle moved into the master bedroom with Mihajson while Vanesa had her own room. Mihajson used the third bedroom to store his belongings, including a marijuana plant. Mihajson did not work, and Weddle knew he sold marijuana, pills, and cocaine.

By this time, Mihajson and Shalonda Morris knew each other, and Morris had introduced her brother, William Morris (William), to Mihajson at the condo. Morris, who was smaller in stature than Mihajson, had breast cancer and smoked marijuana for its medicinal benefits.

In later September or early October 2007, Mihajson and Morris had dinner at the condo and they agreed Morris would purchase one pound of marijuana from Mihajson for $7,500. Karen Reyes was present at the condo. Around this time, Vanesa

told Reyes a few times the drug deal was a ruse and Mihajson planned to steal money from Morris.

The plan was for Morris to meet John Delgadillo at a gas station to get $3,500, in exchange for half a pound of marijuana, and Morris would then meet Mihajson at a smoke shop to purchase the marijuana. On the appointed day, October 10, 2007, Delgadillo called Morris and said he could not make it because he did not have a ride. That day, Morris withdrew $3,300 from a bank at 10:30 a.m., and $4,000 from another bank at 11:21 a.m. The next day, Morris left Delgadillo a voicemail message stating she intended to make the deal herself.

On October 12, 2007, Weddle[1] was scheduled to work at her job from 7:00 a.m. to 4:00 p.m. Weddle, who had turned 18, packed a bag because they had planned to move to Las Vegas that night. Mihajson used Vanesa's minivan to drive Weddle to work and was scheduled to pick her up. Around 7:30 a.m. that morning, Morris dropped off William at his friend's house in Banning.

That morning, Vanesa called her friend, Daniel Lawrence, and asked him to meet her at the mall. They parked near each other, and stood in the parking lot. Vanesa seemed upset, and Lawrence asked what was troubling her. Vanesa told Lawrence that Mihajson told her to stay away from the condo. Lawrence asked why, and she responded, "'You don't want to know.'" She then said it was "'[s]tupid [s]hit'" involving her brothers and she would tell him more later. While they talked, Vanesa received a phone call. When the call ended, Vanesa told Lawrence that Mihajson told her to go to Lowe's and buy plastic sheeting and duct tape. Vanesa asked Lawrence if he would go with her to get the items, which were to be used for painting. As Lawrence drove Vanesa to the store, he asked her why she could not go home, and she replied, "'The only thing I

---

[1]     Weddle testified pursuant to a grant of immunity.

3

can tell you is that it's a drug deal.'" Vanesa purchased plastic sheeting and duct tape. Lawrence drove Vanesa to the condo, where she took the items inside and when she returned, Vanesa seemed "dazed" and "quiet." Lawrence drove Vanesa back to the mall. When Vanesa got into her van, Lawrence saw a .22 rifle inside the van. He asked Vanesa about the rifle and she said Mihajson was making her carry it for protection. Lawrence drove away.

A little later, Vanesa called Reyes and asked if she could meet Reyes at the mall where Reyes worked. Reyes met Vanesa outside the mall. Vanesa told Reyes she could not go home and "they were going to do the fake drug deal and that she didn't know what was really going to happen because her brother had duct tape and the plastic . . . ." Reyes went to work.

Cynthia Garcia,[2] who met Morris in prison and was her long-time partner, saw Morris talking on her cell phone inside their house around 1:30 p.m. After the call, Morris told Garcia that she had spoken with Mihajson and they were now going to meet at his condo instead of the smoke shop because his grandmother was ill. After Morris told Garcia about the change of plan, Morris left their house in her rented 2008 Chevrolet Trailblazer. Cell phone records support the fact Morris drove towards the condo.

About 2:40 p.m., Garcia called Morris. With Garcia hearing audible voices in the background, Morris said she was with Mihajson and that she was going to pick up Garcia's daughter from school. Delgadillo's cell phone records tend to establish Mihajson was at or near the condo just before and just after Garcia's call. At 4:00 p.m., Mihajson did not arrive to pick up Weddle as planned, and he did not respond to

---

[2]     Mihajson asserts Delgadillo is Garcia's father. Although Delgadillo's testimony could be interpreted to support that, Garcia's testimony tends to refute she is Delgadillo's daughter. When asked whether she knew Delgadillo, Garcia replied, "I've met him twice."

4

Weddle's calls or text messages, which was unusual. The last signal from Morris's cell phone, an incoming call at 4:28 p.m., activated the cell tower in Bermuda Dunes, and Mihajson's cell phone activated the same cell tower eight minutes later.

Mihajson and Vanesa picked up Weddle at 5:00 p.m. Mihajson drove to the mall, gave Weddle $300 and Vanesa $400 without explaining where the money came from, told them to go shopping, said he had something to do, and left. Vanesa and Weddle shopped. At some point, Vanesa texted Reyes and asked Reyes to meet her outside Reyes's workplace. As Weddle stood about four feet away, Vanesa and Reyes spoke in hushed tones and in Romanian so Weddle did not know what they were saying. Vanesa told Reyes that "it was done and that there was no more [Morris] and that [Morris] was gone." Vanesa also told Reyes that Mihajson was "cleaning up." Vanesa told Reyes not to tell Weddle because Weddle did not know what had happened. Reyes returned to work.

Vanesa and Weddle later retrieved Reyes's car keys and sat in her car until she was off work when they then drove to Reyes's parents' house. Vanesa and Weddle did not return to the condo because they intended to drive to Las Vegas that night. From the time Mihajson dropped off Vanesa and Weddle at the mall, Mihajson did not return Weddle's numerous calls or texts.

When Mihajson finally picked up Vanesa and Weddle about midnight, he was driving one of his parents' cars, a Chrysler 300. They went to a hotel, which was only about three miles from his parents' house, and checked in there. Mihajson paid for two rooms, one for him and Weddle, and one for Vanesa. Vanesa immediately went to her brother's room where they spoke Romanian to each other. Mihajson pulled money from a backpack and they sat on the bed counting the money, about $7,000.

Meanwhile, Morris did not pick up Garcia's daughter. Garcia's daughter, Garcia, William, and Morris's father all called Morris numerous times without any

5

success.  When Garcia called law enforcement, she was told nothing could be done until the following day.  Mihajson's cell phone activated a cell tower in Coachella at 6:30 p.m.

The next day, Vanesa and Weddle stayed at the hotel all day while Mihajson was gone the entire day.  Weddle asked Vanesa why they were not going to Las Vegas but Vanesa did not have an answer for her which caused Weddle to become suspicious.  Beginning the day after Morris's disappearance, William called Mihajson a few times.  Mihajson insisted Morris never showed up; he did not mention the drug deal.  After a few days, Mihajson would not answer William's calls.

A day or two later, Mihajson, Vanesa, and Weddle went to another hotel.  Weddle wondered why they had not gone to Las Vegas as planned.  Vanesa and Weddle spent the day together because Mihajson had again left for the entire day.  At some point, Weddle saw paint on Mihajson's shorts.  Mihajson paid for them to stay at the hotel a couple days.

A few days later, Mihajson drove them to Las Vegas.  During the drive, Weddle asked Mihajson what was going on.  Mihajson responded, "'You're going to see my face on milk cartons,'" and said he would explain everything to Weddle later.  Mihajson and Vanesa spoke to each other in Romanian.

They checked into a hotel in Las Vegas.  At some point, Weddle received a call on her cell phone where a male and female voice asked to speak to Mihajson, wanted to know where Morris was, and said "'give her back.'"  Weddle held up the phone to Mihajson, who was in the shower, and he told Vanesa to end the call and turn off the phone.  Mihajson said, "'Get [Morris's name] out of your head.'"  Later they all terminated their cell phone plans and got new cell phones.  Mihajson rented a house in Las Vegas for six months.  At some point, Mihajson and Vanesa asked to borrow Weddle's laptop computer.  After they returned the laptop, Weddle browsed the computer's search history and saw they had gone to a local news station Web site.

6

Weeks later, Mihajson, Vanesa, and Weddle drove to the condo at night. Mihajson told them that he was going to park the car in the garage and they needed to quickly grab their belongings. Weddle turned the lights on in the condo and noticed changes throughout: some of the carpet next to her bedroom's entrance was changed or shampooed; the walls in the master bedroom were painted white, like the paint that was on Mihajson's gym shorts; the inserts to the blinds in the master bedroom were missing; and the bed and lampshades in the master bedroom appeared different. Mihajson told Weddle there was a new mattress. Mihajson and Vanesa spoke in Romanian and asked Weddle to step outside. When Weddle went back inside, she saw Mihajson and Vanesa on the ground looking for something. After just 10 minutes in the condo, they made the four hour drive back to Las Vegas.

When they drove back, they picked up Vanesa's minivan in Thousand Palms. Vanesa drove the minivan to Las Vegas while Mihajson and Weddle remained in the Chrysler 300. Once they returned to Las Vegas, they all cleaned the inside of the minivan and Mihajson told Weddle to drive it to the corner and put it up for sale. At some point, Mihajson's brother Victor moved in.

In early November, after he spoke with Reyes and saw news articles about the case, Lawrence called the Riverside County Sheriffs' Department (RCSD) and told Detective Robert Garcia that Vanesa might be in Las Vegas. The following day, RCSD found Morris's vehicle parked in close proximity to the condo and the smoke shop; it appeared to have been parked there for some time.

About a week later, RCSD searched the condo. After they searched the condo and Detective Gary LeClair spoke with Reyes, the case was reclassified from a missing person's case to a homicide. LeClair was the lead investigator. He reviewed reports, spoke with witnesses, gathered evidence, and obtained a search warrant for the condo.

LeClair and other RCSD personnel searched the condo but found no significant forensic evidence. The carpet in the bedroom and hallway had a different texture, a slightly different color, and appeared to be newer than the carpet throughout the rest of the condo.

In early December 2007, LeClair began actively searching for Mihajson and Vanesa. LeClair and other RCSD personnel received information Mihajson and Weddle would be in the Coachella Valley and Weddle would be having lunch at the Elephant Bar in Palm Desert.

On December 11, 2007, LeClair set up surveillance for Mihajson's Chrysler 300. LeClair had a patrol car stop Mihajson's Chrysler 300. Mihajson was driving and Vanesa was in the front passenger seat. Detective Rickie Simms contacted Mihajson, and LeClair arrived. While Simms stayed by the Chrysler 300 and spoke with Vanesa, LeClair took Mihajson to an unmarked patrol unit and spoke with him. Their conversation, which included Vanesa, was recorded.

Mihajson claimed he had never associated with Morris, and Vanesa did not know her. He said the last time he saw Morris was a year earlier. He said he was an auto mechanic, was trying to get a welding job, and was living with his parents. He reluctantly said he lived in a house with Vanesa. Mihajson claimed he was about to join the Army right after Christmas. When LeClair asked Vanesa if she had heard of Morris, Vanesa said she meant no offense, but she "don't really associate with like African Americans." Vanesa said she lived with her parents and Mihajson. LeClair knew Mihajson was not living with his parents and found no evidence he was a mechanic, was trying to get a welder's job, or was about to join the Army. When LeClair handcuffed Mihajson, he yelled to Vanesa in Romanian, "'Don't say anything.'" They were taken to a sheriff's station.

LeClair interviewed Mihajson later that day after advising him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Mihajson said he was

8

19 years old, was Romanian and Yugoslavian, and lived with his parents. He said he was an electronics technician. Mihajson admitted he drank beer and smoked marijuana with Morris on occasion. He also admitted he sold marijuana and cocaine at the smoke shop. Mihajson said he sold marijuana to Morris as a "middle man" but did not "mess[]" with her because Delgadillo told him to stay away from her. He said he had not spoken to Morris in 10 months and had not seen her in a year. Mihajson denied meeting with Morris and denied murdering her. He also denied telling Vanesa to buy plastic sheeting and duct tape and said he wanted to talk to Vanesa.

Meanwhile, Simms and another detective interviewed Weddle at another sheriff's substation. Simms relayed the information to LeClair while he was interviewing Mihajson. Simms returned to the sheriff's station where LeClair was interviewing Mihajson and questioned Mihajson.

Mihajson admitted he gave Weddle and Vanesa about $400 to shop at the mall. Simms said Weddle told him that Mihajson and Morris met at the condo, had dinner, and discussed the drug deal. Mihajson said the night they had dinner they were supposed to make a big deal with Delgadillo, five kilos of cocaine for $50,000, with Mihajson acting as the middle man. He denied he murdered Morris. He said that after he left them at the mall, he went to the condo, retrieved the pound of marijuana, went to the smoke shop, and gave the owner half of it. Mihajson was supposed to pick up $7,000 from the smoke shop owner, but he claimed to not have the money. He went to Delgadillo's and gave the other half to him in exchange for $8,000. Mihajson admitted to staying in various hotels and counting the money at one of them. He stated he did not tell Vanesa or Weddle about the problems with the smoke shop owner, he checked into one of the hotels using his brother's name, he moved to Las Vegas, and they drove to the condo one night to collect their belongings. He denied asking Vanesa to buy duct tape and plastic sheeting and he denied killing Morris. He repeated his request to speak with his sister.

9

LeClair then questioned Mihajson about the condo. Mihajson said there had been a flood on the carpet so it had to be remodeled. He remodeled his bedroom the day he moved out. He replaced the mattress for $500 that day. He admitted having dinner with Morris a couple months before, but he denied seeing her or calling the day of her disappearance. Mihajson said Morris was his friend. After LeClair told him that his cell phone records establish they talked that day, Mihajson said he might have called her, but he denied killing her. He again asked to speak with Vanesa and Weddle. He admitted he had a baton in his car and had access to guns because his father owns them.

After the interview was over, LeClair allowed Vanesa to talk to Mihajson in his interview room hoping they would make admissions on videotape. LeClair monitored their conversation by video in another room. They spoke with each other in both English and Romanian. They did not make any incriminating admissions. Officers arrested Mihajson for having the police baton but not for Morris's murder. Mihajson was released on bail and lived in the Coachella Valley.

Law enforcement officers found no incriminating evidence in searches of Mihajson's parents' residence or the various cars. At some point, law enforcement personnel searched for Morris's remains in a rural part of Banning without success. Morris was not the type of person to simply disappear. The last person to have any contact with Morris was Garcia the afternoon of October 12, 2007. Mihajson and Vanesa were arrested for Morris's murder in June 2008.

*Charging Document & Pretrial Proceedings*

In September 2008, an information charged Mihajson with first degree murder (Pen. Code, § 187, subd. (a)), and alleged the special circumstances he intentionally killed Morris while lying in wait (Pen. Code, § 190.2, subd. (a)(15)), and was engaged in the commission of robbery (Pen. Code, § 190.2, subd. (a)(17)). The prosecution did not seek the death penalty.

10

Garcia testified at the preliminary hearing. When the prosecutor questioned Garcia about the day of Morris's disappearance and what Morris told Garcia she was going to do, defense counsel objected on hearsay grounds. The prosecutor argued Morris's statement to Garcia concerning what she intended to do was admissible pursuant to Evidence Code section 1250[3] on the issue of her intention to do a future act. Garcia testified she last saw Morris about 1:30 p.m. Garcia said Morris told her that she was going to meet Mihajson to purchase marijuana, going to the grocery store, going to cook dinner, and going to meet Garcia on her dinner hour at work. The court ruled Garcia's testimony Morris told her that she was going to meet Mihajson that afternoon was admissible pursuant to section 1250. The prosecutor asked Garcia about a telephone call with Morris at 2:30 p.m. Garcia testified Morris told her that "she was with [Mihajson]," she was going to pick up Garcia's daughter, go to the grocery store, and cook dinner. Over defense counsel's objection, the court also admitted Garcia's testimony Morris was with Mihajson pursuant to section 1250, subdivision (a)(2), evidence offered to prove or explain declarant's acts or conduct.

Before trial, Mihajson filed a motion to set aside the information pursuant to Penal Code section 995. In that motion, as relevant here, Mihajson argued the magistrate erred in admitting Garcia's testimony that during a telephone call Morris told her that she was with Mihajson because there was no offer of proof concerning what acts or conduct needed to be explained as required by section 1250. The prosecutor filed written opposition to that motion arguing the statement was admissible under that section because when considered in context Morris was with Mihajson and she had the future intent to purchase marijuana. At a hearing, the trial court, Judge William S. Lebov, denied the motion to set aside without discussing the admissibility of the evidence.

---

[3]     All further statutory references are to the Evidence Code, unless otherwise indicated.

11

At a subsequent hearing before Judge Graham A. Cribbs, defense counsel again objected to Garcia's testimony that during a telephone call Morris told her that she was with Mihajson because the statement was not admissible under section 1250. The prosecutor argued the statement was admissible pursuant to section 1250 because Morris also told Garcia what she intended to do when she left Mihajson's house, i.e., pick up Garcia's daughter, go to the store, and cook dinner. The court indicated this issue had been previously litigated and after reviewing the moving papers and preliminary hearing transcript, the court stated it could find no legal basis to rule differently than the magistrate.

*Prosecution Evidence*

At trial, Reyes testified Vanesa told her "[t]hat it was done and that there was no more [Morris] and that [Morris] was gone." Reyes stated she understood that to mean Morris was dead. On cross-examination, when defense counsel asked Reyes whether Vanesa had ever used the word "dead" in describing Morris, Reyes answered, "No."

On redirect examination, the prosecutor asked Reyes what Vanesa told her about the drug deal, and Reyes responded, "The only thing I remember was her going back and forth; a lot about that it was going to happen, that it wasn't going to happen, that she talked her brother out of it, that he had changed his mind, that he was going to do it – it was a lot of back and forth, back and forth, until the end when it came to he actually did it and ended up killing someone." The trial court sustained defense counsel's foundation objection and granted his motion to strike the last portion of her testimony. The court also sustained counsel's objections to the prosecutor's questions whether Reyes believed Morris was dead and whether she believed Mihajson killed her.

Defense counsel stated he had just one question on recross-examination and the following colloquy occurred:

12

"[Defense counsel]: And I asked this before, but I feel compelled to ask it again: Vanesa never told you, according to your own statements, that [Morris] was dead. She said [Morris] was gone, right?

"[Reyes]: Vanesa didn't say in exact, word for word, 'My brother killed [Morris]. [Morris] is dead.' She said, 'There is no more [Morris]. [Morris] is gone.' It doesn't take that much brain to figure out what that necessarily means. [¶] And, obviously, if you still don't know where she is, you -- been what -- of the [*sic*] five years later.

"[Defense counsel]: Objection. Nonresponse, sir, at this point.

"[Trial court]: Overruled. You can complete your statement.

"[Reyes]: Five years later, if she's still nowhere to be found, you obviously know she's dead, that they killed her."

"[Trial court]: Next question, counsel.

"[Defense counsel]: No. I'm finished. I don't want any more editorials. Thank you."

Garcia testified for the prosecution. When the prosecutor asked Garcia what Morris told her on the telephone the day Morris disappeared, defense counsel objected on hearsay grounds. The trial court overruled the objection. Garcia answered, "That she was with [Mihajson], and we were talking about her being home to pick up [Garcia's] daughter."[4] When the prosecutor attempted to clarify, Garcia stated Morris told her: "'Don't worry. I'm going to be there to pick her up,' because . . . she was . . . making dinner for her grandfather that evening." On cross-examination, Garcia claimed she did not know Morris was going to purchase marijuana from Mihajson. She did not learn that until later, from William.

---

4    Based on our review of the record, it does not appear the trial court instructed the jury on the limited use of this evidence.

13

Weddle testified Mihajson and Vanesa told her the plastic sheeting and duct tape were used to wrap a pound of marijuana.

*Defense Evidence*

Lawrence testified Vanesa referred to Morris as a "shot caller" and that she carried a gun. On cross-examination, Lawrence testified he never saw Morris so he had never seen her with a gun.

Mihajson testified and admitted he smoked marijuana every day. He said he had known Morris for a few months on October 12 and she had been to the condo once for dinner. He claimed he did not sell drugs out of his condo but instead at the smoke shop. He did not sell marijuana to Morris there though. He denied he sold cocaine. Mihajson once saw Morris with a gun strapped to her leg at Delgadillo's house and the night she was at the condo. Morris told him that she needed the gun for "protection" because she had a dispute with a gang in Los Angeles. He was afraid of Morris because of her gang affiliation and because she carried a gun.

Mihajson stated that on October 10, he and Morris agreed he would sell a pound of marijuana to Morris and Delgadillo. Two days later, Delgadillo, using Morris's phone, called him and cancelled the deal because they did not have the money. Morris called Mihajson and asked to purchase one-half pound, but Mihajson said he would only sell one pound. Mihajson said he sold the pound of marijuana to someone else for $4,000. He denied telling Vanesa the drug deal was a ruse.

Mihajson claimed that during the week of October 12 he was remodeling homes for his father in the Coachella Valley. The paint Weddle saw on his shorts came from him painting for his father. He said that on October 12, he called Vanesa and told her to pick up some plastic sheeting and duct tape because he had to get the marijuana out of the condo. He used the plastic sheeting and duct tape to wrap his marijuana. He denied using the plastic sheeting and duct tape to dispose of a body. He explained that because of asphalt work near his condo, he had to park about 75 yards away and it would

14

have been impossible to carry a dead body through the complex to his car undetected. Mihajson said he replaced the carpet in the condo because his washing machine broke.

Mihajson testified they planned to go to Las Vegas before October 12 to party and relieve stress. He did not move to Las Vegas on October 12. They spent the night at a hotel to celebrate Weddle getting her license because they could not celebrate at the condo. Mihajson said the money they counted in the hotel room came from the pound of marijuana he sold. Mihajson provided testimony explaining why they moved from hotel to hotel.

Mihajson also testified about his interview with LeClair, stating he lied about 90 percent of the time because he was stressed out. He said Weddle was pregnant and LeClair threatened him. He asked for a lawyer five or six times because he needed someone to help him. He said a pound of marijuana sells for between $3,500 to $4,000, not $7,000.

On cross-examination, Mihajson admitted he told Vanesa not to say anything to the police a couple times. He said Garcia must have mistook Delgadillo's alias of "Sean John" or "Chon" with his name, Sean, when Morris told her who she was with when on the phone.

*Closing Argument, Jury Instructions, Verdict, and Sentencing*

During closing argument the prosecutor stated the following:

"I talked to you a lot in jury selection about how you might raise my burden. And I told you about little pitfalls to watch out for. CALCRIM [No.] 220 is reasonable doubt. Judge read it to you. I've just pointed out some highlights that I think are pertinent from my perspective. It's simply proof that leaves an abiding conviction that the charge is true. As simple as that. Do you have an abiding conviction that the defendant is guilty of murder? We need not eliminate all possible doubt, don't have to eliminate imaginary doubt. And on one point that I stressed to you early on that I stressed here, *is that if you have a reasonable doubt, it must be found in and based on the*

15

*evidence you've heard at trial.* [¶] If you are sitting here and you think, '[w]ell, I think I have a doubt' -- I suggest to you one way that you could test that doubt would be to articulate that to your fellow jurors so they can consider it, *whether they think it's reasonable or not; but then you should also be able to point to the evidence. And the evidence is simple: You're either going to have to have an exhibit that you can point out and say, 'right here, this is the evidence that supports my doubt,' or you're going to be able to point to the testimony. If you're pointing to something that you haven't heard in this courtroom, that's not a reasonable doubt.* I'm not required to prove this case beyond possible doubts, imaginary doubts, or anything outside of this courtroom." (Italics added.)

Defense counsel argued Mihajson did not commit the murder because there was no forensic evidence linking him to the crime. Counsel added the prosecution's theory was Mihajson "blew [Morris's] brains out" but there was absolutely no forensic evidence, including no evidence the carpet was pulled up.

During rebuttal argument, the prosecutor stated the following: "You guys remember who has got the burden of proof in this case? I do. That's why I get to come up here a second time. This is called rebuttal argument, and I get to do just that: I get to rebut arguments made by the defense." The prosecutor stated it was not his theory Mihajson shot Morris in the head and there would be blood everywhere because it was not known how she died. After stating there was testimony the forensic technician pulled up the carpet, the prosecutor argued the following:

"So just because they are said, doesn't mean that it's evidence. Right? Just because I say it, just because counsel says it, doesn't mean that's evidence. And that's why you serve as buffers for each other, right, when you say, '*Hey, here is my reasonable doubt and here is the evidence that supports it*.' He says, 'Well, wait a second. *Where is the evidence of that*,' right?" (Italics added.) After stating there was no evidence Morris was a drug dealing gang member with a dangerous past, the prosecutor argued the

16

following:  "See the funny thing that the way this works, I have the burden of proof, but he has the absolute right to call in any witness and produce any piece of evidence he can. He could have brought in any number of people to say, 'You know what?  I bought drugs from [Morris].'  Did he do it?  Nope.  Does he have to?  Nope.  Not his burden.  But if he expects you to believe it, there has got to be evidence to support it.  *If he's giving that to you as a basis for reasonable doubt, there has got to be evidence of it*.  And there is simply none."  (Italics added.)

*Verdicts & Sentencing*

The jury convicted Mihajson of first degree murder and found true the robbery special circumstance but not the lying in wait special circumstance. The trial court sentenced Mihajson to prison for life without the possibility of parole. The court awarded Mihajson 1,678 days of local credit but not any good conduct credits (Pen. Code, § 4019) or work-time credits (Pen. Code, § 2933).  The court adopted and made part of its order the probation officer's recommendations, which included two Penal Code section 1202.45 parole revocation fines, one in the amount of $10,000 and another in the amount of $280.  The court's minute order and the abstract of judgment both reflect a Penal Code section 1202.45 parole revocation fine in the amount of $10,000.

DISCUSSION

I. *Evidentiary Claims*

A. *Garcia's Testimony Regarding Telephone Call with Morris*

Mihajson argues the trial court erred in admitting Garcia's testimony that during a telephone call the day of Morris's disappearance, Morris told Garcia that she was with Mihajson because the statement was not admissible pursuant to section 1250. We agree the court erred but conclude Mihasjon was not prejudiced.

17

Section 1250 states an exception to the hearsay rule for statements of a declarant's then existing state of mind. It provides that such statements are admissible as an exception to the hearsay rule when offered either to prove the declarant's state of mind when the declarant's state of mind is itself in issue or the evidence is offered to prove or explain acts or conduct of the declarant. (*Id.*, subd. (a)(1), (2).) We review a trial court's evidentiary ruling for an abuse of discretion. (*People v. Streeter* (2012) 54 Cal.4th 205, 238.)

The prosecutor argued at trial Morris's statement was admissible to explain her acts or conduct because it showed what Morris intended to do after the telephone call with Garcia—purchase marijuana and pick up Garcia's daughter. On appeal, the Attorney General similarly asserts Morris's statement was admissible because it explained her future act of purchasing marijuana from Mihajson. The Attorney General also adds the statement was relevant because William testified Mihajson told him that Morris never showed up to complete the drug deal and his defense was he did not meet with Morris.

Morris's statement to Garcia she was with Mihajson may have been relevant to prove Mihajson killed her but for that purpose the statement was inadmissible hearsay. (*People v. Hernandez* (2003) 30 Cal.4th 835, 872 (*Hernandez*), overruled on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32; *People v. Noguera* (1992) 4 Cal.4th 599, 620-621.) Additionally, Morris's statement to Garcia that she was with Mihajson was not admissible pursuant to section 1250, subdivision (a)(2), because it did not explain Morris's conduct. Morris's intent to purchase marijuana or her intent to pick up Garcia's daughter was not at issue in the case. The only issue was whether Mihajson killed Morris, and what Morris intended to do after the telephone call did not assist the jury in answering that question. The only relevant portion of Morris's statement was that she was with Mihajson when she spoke with Garcia. That was inadmissible hearsay because its sole purpose was to place Morris with Mihajson

18

immediately preceding her disappearance.  An out-of-court statement must be relevant and admissible pursuant to an exception to the hearsay rule.  (*Noguera, supra,* 4 Cal.4th at pp. 620-621.)  *Hernandez, supra,* 30 Cal.4th 835, is instructive.

In *Hernandez, supra,* 30 Cal.4th at pages 849-851, during the penalty phase of a capital murder trial, the prosecution introduced evidence defendant had committed an uncharged murder.  This evidence came in the form of out-of-court statements from the victim in which he expressed his fear defendant and two other men were going to kill him.  (*Id.* at pp. 871-872.)  Our Supreme Court held these statements to be inadmissible hearsay, explaining a murder victim's expressed fear of the person charged with the murder is inadmissible when the purpose is to prove the killer's identity.  (*Id.* at p. 872.)  While the prosecution argued the statements were admissible to prove the victim's state of mind, the court explained that neither his mental state nor his conduct was an issue in the case.  (*Id.* at pp. 872-873, citing *Noguera, supra,* 4 Cal.4th at p. 622 [victim's state of mind and conduct not in issue when the only disputed issue was killer's identity].)

Although we are not concerned here with a statement of Morris's fear to prove Mihajson was the killer, we are concerned with Morris's out-of-court statement she was with Mihajson to prove he was the killer.  Based on *Hernandez* and *Noguera*, Morris's out-of-court statement she was with Mihajson was inadmissible to prove Mihajson was the killer.  Thus, the trial court erred in admitting Garcia's testimony that during a telephone call Morris told her that she was with Mihajson.

"It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice.  [Citation.]  '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'  (*People v. Watson* (1956) 46 Cal.2d 818, 836 . . . .)" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

19

Although the trial court erred in admitting the hearsay statement, the error does not require reversal. While much of the evidence was circumstantial, the prosecutor presented a strong case supporting the conclusion Mihajson met with Morris the day she disappeared and he murdered her. There was evidence Morris and Delgadillo planned to buy one pound of marijuana from Mihjason for $7,500, and after Delgadillo backed out, Morris decided to proceed with the deal, as evidenced by the fact she withdrew $7,300 a couple days before she disappeared. At 1:30 p.m., the day Morris disappeared, Morris told Garcia she had spoken with Mihajson and she was going to meet him at the condo instead of the smoke shop. Cell phone records supported the conclusion Morris drove towards the condo to meet Mihajson who was at the condo. The jury could reasonably rely on this evidence to conclude Morris went to the condo to purchase one pound of marijuana from Mihajson for $7,500.

The evidence established Morris thought the drug deal was legitimate, but the evidence painted a different picture with respect to Mihajson's intentions. Vanesa repeatedly told Reyes the drug deal was a ruse and Mihajson planned to steal the money. There was evidence Vanesa's friend took her to buy plastic sheeting and duct tape at Mihajson's request and Vanesa later told Reyes she did not know what Mihajson was going to do with the plastic sheeting and duct tape.

Evidence established Morris failed to pick up Garcia's daughter that afternoon as she had promised to do and she did not respond to numerous calls or texts. Mihajson's cell phone records tend to establish he was at or near the condo between 2:00 p.m., and 3:00 p.m. Most telling, cell phone records demonstrated Morris received an incoming call at 4:28 p.m., activating a cell tower, and Mihajson's cell phone activated the same cell phone tower eight minutes later. Based on this evidence, the jury could certainly conclude Mihajson and Morris were together that afternoon.

20

Additionally, Mihajson gave Vanesa and Weddle a total of $700 to spend at the mall that evening, and he disappeared for a few hours. At the mall that evening, Vanesa told Reyes "it was done and that there was no more [Morris] and that [Morris] was gone[,]" and Mihajson was "cleaning up." Later, Weddle noticed the condo had been remodeled, including paint that matched the paint on Mihajson's shorts. Finally, the evidence at trial demonstrated Mihajson fled the area and moved from hotel to hotel and engaged in other subterfuge over the course of the next few weeks. At one of the hotels, Mihajson, Vanesa, and Weddle counted $7,000, an amount that roughly matched the amount taken in the fake drug deal.

This was adequate evidence for the jury to conclude Mihajson planned to steal money from Morris, killed her, wrapped and taped her body in the plastic sheeting, disposed of her body, and cleaned the condo to remove any incriminating evidence. Based on a complete reading of the record, there was strong evidence Mihajson murdered Morris, and neither the jury's request for readback of testimony nor the length of its deliberations alters our conclusion. Thus, there is sufficient evidence supporting Mihajson's conviction under both the federal and state constitutional due process clauses. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

*B. Reyes's Testimony Concerning Mihajson's Guilt*

Mihajson contends the trial court erred in overruling defense counsel's objection to Reyes's opinion testimony Morris was dead and Mihajson killed her. Again, we agree the trial court erred and conclude, again, Mihajson was not prejudiced.

"'A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party.' [Citation.] A motion to strike must be timely made and must clearly state the specific ground for the motion. [Citation.] Moreover, '[a] motion to strike must be directed with precision to the matter

21

sought to be stricken. [Citation.] A motion to strike out inadmissible evidence may properly be denied where it is general and embraces evidence which is admissible as well as that which is inadmissible. [Citations.]' [Citations.] If part of the answer is responsive and part is nonresponsive, the moving party must specify the nonresponsive part, and a motion to strike the entire answer as nonresponsive may properly be denied. [Citation.]" (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1414.)

Here, the trial court erred when it overruled defense counsel's objection Reyes's answer was nonresponsive. We again provide the exchange:

"[Defense counsel]: And I asked this before, but I feel compelled to ask it again: Vanesa never told you, according to your own statements, that [Morris] was dead. She said [Morris] was gone, right?

"[Reyes]: Vanesa didn't say in exact, word for word, 'My brother killed [Morris]. [Morris] is dead.' She said, 'There is no more [Morris]. [Morris] is gone.' It doesn't take that much brain to figure out what that necessarily means. [¶] And, obviously, if you still don't know where she is, you -- been what -- of the five years later.

"[Defense counsel]: Objection. Nonresponse, sir, at this point.

"[Trial court]: Overruled. You can complete your statement.

Although defense counsel's question could be interpreted as compound, Reyes's response certainly exceeded the scope of what counsel asked. After counsel said Vanesa never told her that Morris was dead, which Reyes could have answered "No" based on her previous testimony, the prosecutor asked whether Vanesa said she was gone, which based on her previous testimony Reyes could have answered, "Yes." Defense counsel's question(s) called for yes or no answers, and much of Reyes's editorializing exceeded the call of the question.

After the trial court overruled defense counsel's objection and allowed Reyes to continue her answer, Reyes stated, "Five years later, if she's still nowhere to be

22

found, you obviously know she's dead, that they killed her." Although Mihajson asserts any objection to this testimony would have been disrespectful because the court overruled counsel's objection, counsel could have certainly objected this was improper lay testimony that invaded the jury's province to determine the defendant's guilt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 [witness may not testify as to defendant's guilt].) Defense counsel did not object to this testimony or request the trial court strike it. Because counsel never objected to this response or requested the court to strike the testimony he cannot now complain on appeal it was improperly admitted. It is of no consequence, however, because as we explain above, there was strong evidence of Mihajson's guilt and thus, he was not prejudiced by the admission of Reyes's testimony.

## II. Prosecutorial Misconduct & Ineffective Assistance of Counsel

Mihajson argues the prosecutor committed misconduct during closing argument when he misstated the reasonable doubt standard and shifted the burden of proof by telling the jury a reasonable doubt must be based on evidence offered at trial. He also claims his defense counsel provided deficient performance because he did not object to the prosecutor's misstatements.

The Attorney General contends Mihajson forfeited appellate review of this issue because defense counsel did not object and request an admonition, nor does he on appeal explain why any objection would have been futile. As to the merits, the Attorney General asserts that pursuant to *People v. Hill* (1998) 17 Cal.4th 800, 831-832, the prosecutor's statements were "arguabl[y]" error but when considered in their "full context" the prosecutor did not commit misconduct. The Attorney General concludes Mihajson was not prejudiced by any error. We agree with the Attorney General that Mihajson forfeited the claim.

"'To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the

23

prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm.' [Citation.] A claim will not be deemed forfeited due to the failure to object and to request an admonition only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

Here, Mihajson's defense counsel did not object to the prosecutor's statements and request an admonition, and he does not claim any objection would have been futile. Therefore, his claim is forfeited. However, Mihajson also asserts his defense counsel was prejudicially ineffective. We will address his claim within that context.

"In order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.] Moreover, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate. [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 40-41, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, it is not reasonably probable the result of the proceeding would have been different had defense counsel objected to the prosecutor's statements and requested an admonition. As we explain above more fully, there was strong evidence of Mihajson's

24

guilt.  Second, it is not reasonably likely the jury applied any of the prosecutor's statements in an objectionable manner.  The trial court instructed the jury with CALCRIM No. 200, which stated that if anything counsel said conflicted with the court's instruction, the jury must follow the court's instructions.  The court also instructed the jury that because Mihajson was presumed innocent, he did not have to prove he is not guilty (CALCRIM No. 100).  And the court instructed the jury with CALCRIM No. 220, which properly advised the jury of the reasonable doubt standard.   The court also instructed the jury that before it relied on circumstantial evidence to draw a conclusion, the prosecutor had to prove each fact essential to that conclusion beyond a reasonable doubt.  Finally, in instructing the jury on corpus delicti, the court stated the jury could not convict Mihajson unless the prosecution proved his guilt beyond a reasonable doubt.  Taken together, we conclude these instructions properly informed the jury of the prosecution's burden, and any error was not prejudicial.  (*People v. Casey* (2007) 41 Cal.4th 109, 130 [we presume jurors intelligent and capable of following trial court's instructions.)

III.  *Cumulative Error*

Mihajson claims the cumulative effect of the errors requires reversal. Although we conclude the trial court erred in admitting evidence, we conclude the error was harmless.  Again, the record includes strong evidence Mihajson murdered Morris. Thus, his claim has no merit.

IV.  *Sentencing Claims*

A.  *Parole Revocation Fine*

Mihajson argues his Penal Code section 1202.45 parole revocation fine must be stricken because he was sentenced to prison for life without the possibility of parole.  The Attorney General concedes the error.

25

"A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole. [Citation.]" (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) As the trial court sentenced Mihajson to life without the possibility of parole, there can be no parole, and thus, the court erred in imposing the Penal Code section 1202.45 parole revocation fine. The fine is stricken.

B. *Credits*

Mihajson contends the abstract of judgment must be amended to reflect an award of 1,678 actual days served. The Attorney General again concedes the issue.

"[Penal Code s]ection 2933.2 provides that convicted murderers are not entitled to credits pursuant to [Penal Code] sections 2933 and 4019, but those provisions concern work time credits and conduct credits. They do not address presentence custody credits. [Citation.] [¶] [Penal Code s]ection 2900.5 awards defendant credit for all days spent in custody. This provision applies to all defendants. [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 289.)

At the sentencing hearing, the trial court awarded Mihajson 1,678 days of credits for actual days served. Neither the court's minute order nor the abstract of judgment reflect the award of credits for actual days served pursuant to Penal code section 2900.5. A trial court's oral pronouncement of judgment controls. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) Thus, we order the abstract of judgment amended to reflect the trial court awarded Mihajson 1,678 days of actual credit pursuant to Penal Code section 2900.5. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [court of appeal may correct clerical error in abstract of judgment].)

DISPOSITION

The judgment is affirmed as modified. The Penal Code section 1202.45 parole revocation fine is stricken. The abstract of judgment should be corrected to reflect Mihajson has 1,678 days of actual credit. The clerk of the superior court is directed to

prepare an amended abstract of judgment consistent with this opinion and forward it to the Department of Corrections and Rehabilitation, Division of Adult Operations.


                                        O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


THOMPSON, J.